# Richmond

GUY H. FULLER v. COMMONWEALTH OF VIRGINIA.

October 10, 1949.

Present, All the Justices.

EGGLESTON, J., delivered the opinion of the court.

*Earl H. Davis,* for the petitioner.

This case is before us for the second time. See *Fuller* v. *Commonwealth,* 189 Va. 327, 53 S. E. (2d) 26.

The plaintiff in error was convicted by a jury of having seduced under promise of marriage, Shirley M. Jackson, an unmarried female of previous chaste character, and his punishment fixed at confinement in the penitentiary for two years. To the judgment or order entered on the verdict on July 7, 1948, we awarded a writ of error and *supersedeas.*

Because that judgment or order was not final and we were without jurisdiction of the matter the writ was dismissed. *Fuller* v. *Commonwealth, supra.* Although the case had been fully briefed and argued before us, we were not then in a position to dispose of it on the merits.

Upon the receipt of our former mandate the trial court, after considering the report of the probation officer to whom the matter had been referred, entered a final judgment sentencing the plaintiff in error in accordance with the verdict, but suspending the execution of the sentence and placing him on probation for a term of two years.

The case is now before us upon the petition that we grant a writ of error to the final judgment and consider and dispose of it upon the assignments of error, the record, briefs and oral arguments previously submitted to us.

The main assignment of error is that the evidence is insufficient to support the verdict. While the illicit relationship was admitted by the accused, he claims that there is not sufficient evidence to warrant the finding that the prosecutrix yielded to him "under promise of marriage, conditional or unconditional," as is required by Code, section 4410. Moreover, he says, the evidence is insufficient to justify a finding that the testimony of the prosecutrix as to the promise of marriage was corroborated, as required by Code, section 4413.

The alleged offense occurred on December 18, 1946, at the home of the prosecutrix in Arlington county where she lived with her parents and an elder sister. At the time she was sixteen years of age and in the second year of high school. The accused lived with his parents in the District of Columbia and was a student at the Bell Vocational School, from which he was to graduate in February, 1949. He was eighteen years of age.

The first meeting of the two principals occurred in the spring of 1946. Thereafter they "dated" each other several times a week, going to roller-skating rinks and moving pictures and indulging in other innocent pleasures until December, 1946.

On the evening of December 17, 1946, the accused telephoned the prosecutrix at her home in Arlington, telling her that he had a present for her which he wanted to deliver on the next day, that being her sixteenth birthday. During the conversation it was agreed that the accused would call at the home of the prosecutrix the next morning and bring the present with him after her parents and sister had left for their respective places of employment in the city of Washington. According to the testimony of the prosecutrix she expected the accused to arrive about 11 a. m., and therefore was not dressed when he showed up about 9:30 a. m., but was attired in her pajamas and bathrobe.

She further testified that for about half an hour they remained in the living room and discussed, among other

things, their plans for marriage. "Petting" led to improper "advances" by the accused, and as the result of their "mutual reaction" they retired to her bedroom and had sexual intercourse for the first time. It was, she said, her first experience.

According to the story of the accused, by prearrangement the prosecutrix had left the door to her home unlocked and upon his arrival at the house he went directly to her bedroom. According to the testimony of both he remained at the house until about 3 o'clock in the afternoon of that day.

The prosecutrix testified that prior to this incident they had frequently "talked about getting married" "when he finished school." Moreover, she said that she yielded to his advances at the time of their first illicit relation upon his express promise to marry her. To use her words: "We talked about getting married and what we were going to do when he finished school and then he began to make advances, and I told Guy, I said I had never been intimate before, that we had gone together seven months and why should anything come up between us now, and he said not to worry about anything. He said as long as we would get married, he said it would not make any difference. It was with that promise of marriage—there wasn't any doubt in my mind we would not." Again she said: "He said not to worry about anything. As far as that was concerned we would get married."

After this incident the two young people "dated" each other several times a week until the midsummer of 1947. During this period they frequently indulged in sexual intercourse.

In February, 1947, Mrs. Jackson, the mother of the prosecutrix, accidentally discovered a diary in which the prosecutrix had made an entry referring to her improper relations with the accused. Mrs. Jackson did not disclose this to her husband, but according to her testimony upbraided the ac-

cused for his misconduct. According to her the accused replied: "Mrs. Jackson, I intend to marry Shirley."

The accused denied that he had promised the prosecutrix either at the time of their first intimacy, or at any other time, to marry her, or that he had made the statement attributed to him by Mrs. Jackson. In short, his story is that they indulged in such intimacies merely to gratify their mutual sexual desires.

He denied that he really loved the prosecutrix. But his conduct belied his words, for he admitted that he continued paying her devoted attention, and it appeared to the members of the girl's family that the two young people were very much in love with each other. Her father said that "it was understood from all indications" that they intended to be married. They exchanged presents at Christmas, 1946, and on their respective birthdays. According to the members of the family of the prosecutrix she "dated" no one else and fixed her attentions and affection on the accused.

In September, 1947, the accused while on a vacation in North Carolina wrote the prosecutrix a very endearing letter. During the preceding month while she was away she wrote him similarly. However, none of these letters referred to their engagement or intended marriage.

In October, 1947, the two young people resumed their association which continued until the accused discovered in the diary of the prosecutrix an entry which aroused his suspicion that she was having "dates" with other young men, particularly one David Edelen, a married man employed at a mercantile agency in Washington, at which the prosecutrix worked during the preceding summer. From this point on their relationship began to cool.

In November, 1947, for the first time, the prosecutrix informed the accused that she was pregnant. He denied responsibility for her condition but did not break the relationship with her. The parents of the accused were then notified of the situation and they had several conferences with the prosecutrix and her mother. It was suggested that

the expected child be gotten rid of by an abortion, but this plan was abandoned.

About this time the prosecutrix and her mother began to insist that the accused marry the prosecutrix, but he refused to do so because of his expressed doubt as to his paternity of the expected child.

Upon advice of counsel the mother of the prosecutrix reported the situation to the district attorney for the District of Columbia, but when that official discovered that the offense, if any, had been committed in Arlington county, Virginia, no further steps were taken by him. Shortly thereafter the matter was presented to the grand jury in the Circuit Court of Arlington county, and the present indictment followed.

It is plain from what has been said that there was sufficient evidence to warrant the jury in finding that the prosecutrix yielded to the advances of the accused "under promise of marriage, conditional or unconditional." Her testimony on the subject, which we have related, is clear and positive and has been accepted by the jury. We perceive in the circumstances nothing to justify our saying that her story is incredible, that it should have been rejected as unworthy of belief, and that instead the jury should have accepted that of the accused.

As is said in 47 Am. Jur., Seduction, section 9, p. 634, "the promise need not be a promise to marry immediately, but may relate to marriage in the future. For example, a promise to marry when the promisor has finished a course of study at school, followed by intercourse consented to on the faith thereof, will sustain a criminal prosecution for seduction, * * * ."

Our next inquiry is whether there was sufficient evidence to warrant the finding by the jury that the testimony of the prosecutrix as to the promise of marriage was corroborated as required by Code, section 4413. This section provides: "No conviction * * * shall be had on the testimony of the female seduced, * * * unsupported by other evidence, * * * ."

We pointed out in *Mills* v. *Commonwealth*, 93 Va. 815, 818, 22 S. E. 863, that in order to meet the requirements of the statute the corroborating testimony "must be evidence which does not emanate from the mouth of the seduced female; that it must not rest wholly upon her credibility, but must be such evidence as adds to, strengthens, confirms and corroborates her."

Again, as was said in *Riddleberger* v. *Commonwealth*, 124 Va. 783, 785, 786, 97 S. E. 310:

"To sustain such a conviction it is well settled that the corroborating evidence need not be direct but may be circumstantial, or partly direct and partly circumstantial evidence. Touching the promise of marriage, it is also well settled that the supporting evidence need be such only as the character of that matter admits of being furnished. As said in the case of *Lasater* v. *State*, 77 Ark. 468, 94 S. W. 59: 'The promise of marriage is not an agreement usually made in the presence ·or with the knowledge of third persons. Hence, the supporting evidence possible in most cases is the subsequent admission or declaration of the party making it; or the circumstances which usually accompany the existence of an engagement of marriage * * * .' The corroborating evidence need not be sufficient to convict independent of the testimony of the prosecutrix, but it is sufficient if it supplies such facts or circumstances as tend to support such testimony upon the essential elements of the offense. *Creighton* v. *State* (Tex. Cr. App.), 61 S. W. 492. 'And when there is other evidence fairly tending to support the prosecutrix upon facts essential to constitute the offense, it is for the jury to say whether she is corroborated.' *Idem*."

See also, *Shaver* v. *Commonwealth*, 151 Va. 545, 552, 145 S. E. 377; *Akers* v. *Commonwealth*, 155 Va. 1046, 1054, 156 S. E. 763.

In applying these principles we have held that the testimony of the prosecutrix is sufficiently corroborated by evidence of subsequent admissions of the accused (*Hausenfluck* v. *Commonwealth*, 85 Va. 702, 706, 8 S. E. 683;

*Harding* v. *Commonwealth,* 132 Va. 543, 546, 110 S. E. 376); by frequent visits over a period of several months *(Shaver* v. *Commonwealth, supra,* 151 Va., at page 553), and by other circumstances.

In the case before us we have evidence of the admission of the accused to the mother of the prosecutrix, that the accused, when called to account for the illicit relations, told the mother that he intended to marry the prosecutrix.

That the accused continued his frequent visits and devoted attentions to the prosecutrix, both preceding and following the alleged misconduct, is abundantly proven and freely admitted by him. During this time it was apparent to the members of the family of the prosecutrix and their friends that the two young people were much enamored of each other.

As might be expected, there is evidence of circumstances which tend to discredit the girl's testimony of a promise of marriage. While her diary contains many entries of her "dates" with the accused, and even a confession of her misconduct with him, the subject of their intended marriage—perhaps the most important event in her life—is not mentioned. It is also true that in the letters which passed between the two in the summer of 1947 there was no mention of marriage. Nor did they discuss the subject with their parents.

The absence of these circumstances, and the presence of others upon which the accused relies, merely affect the weight of other incriminating facts, but do not destroy their credibility. See *Shaver* v. *Commonwealth, supra* (151 Va., at pages 553, 554); *Judd* v. *Commonwealth,* 146 Va. 267, 271, 135 S. E. 710.

Without objection the jury were fully and clearly instructed on the different phases of the case. They were plainly told that they could not convict the accused on unsupported evidence of the prosecutrix, "but there must be other evidence, not emanating from her mouth, which adds to, strengthens, confirms and corroborates hers." It

was peculiarly their function to pass upon the weight and sufficiency of the corroborating evidence.

The fact that the corroborating evidence may not appear to us to be very satisfactory or convincing does not warrant us in substituting our appraisal of it for that of the jury. See *Atkins* v. *Commonwealth*, 132 Va. 500, 505, 110 S. E. 379; *Judd* v. *Commonwealth, supra* (146 Va., at page 271).

Error is assigned to the action of the trial court in permitting the Commonwealth to present further testimony after it had rested its case. Aside from the fact that the incidents were trivial and inconsequential, the matter was clearly within the discretion of the trial court.

The final assignment of error is that the trial court should have set aside the verdict of the jury because of the testimony of a juror concerning his actions and attitude with respect to the verdict.

The record discloses that on the day after the verdict had been rendered, and while the motion for a new trial was pending, the foreman of the jury visited the home of the judge of the trial court and expressed some misgivings as to the verdict. Thereupon the judge notified the attorney for the Commonwealth and counsel for the accused of the situation, and the juror, after being sworn, was fully examined in open court. He testified that although the verdict was read in open court, and upon a polling of the individual jurors he had announced his acquiescence therein, it was not in fact his "honest verdict."

He further testified that he did not clearly understand the instructions and that some of them appeared to be in conflict with others. Moreover, he said, since he believed "in the majority rule," he had reluctantly, but without coercion, consented to agree with his colleagues.

We are of opinion that the trial court was correct in refusing to consider the testimony of this juror on the motion to set aside the verdict.

The authorities agree that the testimony or affidavits of jurors impeaching a verdict rendered by them will not

be received "where the facts sought to be shown are such as inhere in the verdict." 53 Am. Jur., Trial, section 1105, pp. 769, 770.

Mr. Wigmore bases the exclusion of such evidence upon the principle that since the verdict is the "sole embodiment of the jury's act," it may not be varied or contradicted by parol evidence. See Wigmore on Evidence, 3d Ed., Vol. 8, section 2348, p. 666; *Idem*, section 2349, p. 668. See also, 33 Va. Law Review 538. Compare Burks Pleading and Practice, 3d Ed., section 297, pp. 533, 534.

Other authorities say that since such evidence would encourage tampering with the jurors, would induce a dissatisfied juror to destroy a verdict to which he has assented, and would cast doubt upon the finality of verdicts, public policy forbids that it be admitted. 53 Am. Jur., Trial, section 1105, p. 770; *Steptoe* v. *Flood*, 31 Gratt. (72 Va.) 323, 344.

For obvious reasons, after the discharge of the jury, a juror should not be permitted to say that he unwittingly surrendered his independent view to that of his colleagues, and that hence the verdict to which he has assented is not, in fact, his "honest verdict." See 46 C. J., New Trial, section 381, p. 360.

Moreover, as Mr. Wigmore says, "it is today universally agreed that, on a motion to set aside a verdict and grant a new trial, the verdict cannot be affected, either favorably or unfavorably, by the circumstances (among others): that one or more of the jurors *misunderstood* the judge's *instruction*." Wigmore on Evidence, 3d Ed., Vol. 8, section 2349, p. 669. See also, 53 Am. Jur., Trial, section 1106, p. 771.

It is true that in *Hague* v. *Stratton*, 4 Call (8 Va.) 84, decided in 1786, by a divided court, a new trial was awarded "upon the suggestion (*sic*) of a juror that he mistook the testimony and its application to the law."

However, in *Harnsbarger* v. *Kinney*, 6 Gratt. (47 Va.) 287, decided in 1849, the opposite conclusion was reached.

In the last-mentioned case after the verdict of the jury had been approved by the trial court as being supported by the evidence, it was subsequently set aside upon the affidavits of three jurors that they had assented to the verdict under a mistake or misunderstanding of the instructions of the court. One of the jurors swore that but for such mistake he would not have assented to the verdict. In holding that the trial court committed reversible error in setting aside the verdict on this ground, this court said:

" * * * That to permit a verdict which, in the opinion of the court that tried the cause, was not contrary to the evidence, and by which, for aught that appears to this court, full justice was done, to be set aside upon the evidence of a few of the jurors, made under the circumstances described by the record, respecting their understanding of an instruction of the court upon questions of law raised at the trial, would lead to dangerous consequences, as holding out inducements to tamper with the jurors after they had dispersed, and may have forgotten the circumstances which did actually occur. * * * " (6 Gratt. (47 Va.), at page 300.)

This later holding was expressly approved in *Koiner* v. *Rankin*, 11 Gratt. (52 Va.) 420, 431, and in *Danville Bank* v. *Waddill*, 31 Gratt. (72 Va.) 469, 483.

In neither of the latter opinions is mention made of the earlier contrary holding in *Hague* v. *Stratton, supra.* Indeed, so far as we have been able to find, *Hague* v. *Stratton, supra,* has not been cited or referred to in any opinion of this court.

In *Norfolk, etc., Ry. Co.* v. *White,* 158 Va. 243, 256, 257, 163 S. E. 530, a public crossing case, we held that the trial court correctly refused to receive and read the affidavits of jurors that they had not understood and properly applied the instructions of the court with respect to mitigation of damages.

The fact that in the present case the juror first voluntarily disclosed his misgivings or change of mind with respect to

the verdict to the trial court does not, in our opinion, take it out of the general rule.

We overrule the holding in *Hague* v. *Stratton, supra,* and adhere to the principle announced in our later decisions and that exemplified in the authorities to which we have referred that after the discharge of the jury a juror will not be heard to impeach the verdict to which he has agreed by saying that he misunderstood the instructions of the court.

On the whole we find no error in the record and the writ is denied.

*Writ of error denied.*