# Staunton

## GENEVA A. PHILLIPS v. JOHN NELSON CAMPBELL.

September 10, 1958.

Record No. 4821.

Present, Eggleston, C. J., and Spratley, Buchanan, Miller, Whittle and Snead, JJ.

The opinion states the case.

*Stilson H. Hall* and *Lucas D. Phillips*, for the plaintiff in error.

*Frank L. Ball* (*Ball, McCarthy, Ball & Embrey*, on brief), for the defendant in error. ·

MILLER, J., delivered the opinion of the court.

██ Geneva A. Phillips obtained a verdict against John Nelson Campbell for $25,000 for personal injuries caused by his negligent operation of an automobile. On Campbell's motion the verdict was set aside and a new trial ordered, limited to the quantum of damages. At the second trial a verdict of $7,500 was returned upon which judgment was entered. From this judgment Geneva A. Phillips appealed.

The litigants will be referred to as plaintiff and defendant in accordance with their positions in the trial court.

At the first trial it was conclusively proved that plaintiff, a pedestrian, was injured as a proximate result of defendant's negligent operation of his automobile. Without objection, the jury was instructed to find for plaintiff, and the only issue submitted to it was the amount of damages.

Upon return of the verdict for $25,000, defendant moved to set it aside because it was excessive. A few days later he filed a written motion and asked that it also be set aside ˙because of alleged misconduct of the jury.

Plaintiff assigns as error the court's ·action in vacating the verdict, and specifically asserts that the court erred by allowing the jurors to impeach their verdict by testifying as to what influenced or did not influence them in fixing the· damages at $25,000. She also insists that the award was not excessive and asks that the first verdict be reinstated.

About a week after the first trial counsel received from the judge a letter, the material parts of which follow:

"In re: Phillips vs. Campbell

"Gentlemen:

"Immediately after the trial of this case on Friday, September 23rd, the foreman of the jury, Mr. Westwater, came to the Clerk's Office and indicated to the Clerk and me that the jury had based its verdict on the theory that the defendant's insurance company should pay $20,000.00 of the verdict and the defendant, $5,000.00.

"I feel it my duty to bring this rather surprising development to the attention of counsel for any advice which you may care to offer."

It was after receipt of this letter that defendant amended and elaborated upon his motion that had been made upon return of the verdict. In his amended motion he asserted that the jury had been actuated by prejudice and influenced by the fact that defendant was intoxicated when he injured plaintiff. Defendant also moved the court to set aside the verdict because of alleged misconduct of the jury in assuming that he carried public liability insurance on his automobile, and in discussing and considering that circumstance during its deliberations. Over plaintiff's objection the court allowed defendant to call six of the jurors who testified to their discussion in the jury room of whether or not defendant carried liability insurance, and if so, in what amount, and what effect their assumption that he was insured had upon the amount of their verdict. These jurors were questioned at length as to what was said by them about insurance, whether they knew that defendant's vehicle was insured, and if so, what effect insurance or lack of insurance had upon the amount of the verdict.

There is no indication that insurance was mentioned at any time during the trial until the jurors retired to their room to consider of their verdict.

Summarized, their testimony discloses that they discussed whether or not defendant carried liability insurance on his automobile, and it was assumed by some that he did, and there was speculation and discussion as to whether or not he probably carried $15,000 to $20,-000. One juror stated that he assumed that Campbell had insurance because he was represented by Mr. Ball, and they understood that he "was an insurance lawyer." Some testified that whether he carried insurance or not did not influence them in the amount awarded, but two stated that it entered into their consideration. Typical of some of the questions propounded to the jurors and the answers given are the following:

"Q. * * * Was the question of insurance taken into consideration in reaching your verdict?

"A. I think, to be perfectly frank, I would have to say yes, but I would say among so many things we had to put together, I do not say it was the basis of our evaluation, but it was considered. I will put it that way.

"Q. Would you say it entered into the determination as a part of the basis to any extent, even if it was to a small extent?

"A. I would have to say yes, yes, sir."

\* \* \* \* \* \* \*

"Q. Did you assume that he had insurance?

"A. Yes, sir. I figured he had some insurance. I did not have any idea what amount.

"Q. Did the fact that you assumed he had insurance enter into reaching your decision as to the $25,000?

"A. No. I could not say that it did."

\* \* \* \* \* \* \*

"Q. Did you discuss whether or not Mr. Campbell had liability insurance?

"A. It was discussed there if he had it or not.

\* \* \* \* \* \* \*

"Q. You did not know whether he carried any?

"A. No, I did not know whether he carried any, only I supposed by Mr. Ball being the insurance lawyer that he did.

"Q. Did you think that the $25,000 was the amount of damage the Plaintiff had sustained? Did you think that was a fair amount?

"A. Well, first, as the jury was up and down, some was for $10,-000, $15,000, and some went up as high as $35,000, and so my idea was $10,000 or $15,000 was fair, at first. \* \* \*"

\* \* \* \* \* \* \*

"Q. Was the question of insurance pressed on any of the men in order to get them to the figure of $25,000? Do you know what I mean?

"A. Yes. I cannot remember that being pressed on them, no.

"Q. In your opinion did the question of insurance enter into your conclusion in arriving at $25,000?

"A. Well, maybe some, yes."

The clerk of the court, who was present when juror, foreman Westwater, engaged the trial judge in conversation following rendition of the first verdict, testified that the juror came in the clerk's office, and in the course of his remarks asked some questions and indicated that he and other jurors had discussed whether or not defendant was insured, and if so, in what amount. The clerk's

recollection and the impression left upon him by the juror's questions and remarks are indicated in the following testimony:

"Q. Did he make any statement to the effect that the jury considered that Mr. Campbell would have to pay $5,000 over and above his insurance, or words to that effect?

"A. I got the impression that they did take that in consideration, yes, sir, the way he himself, at least talked, $20,000 and Mr. Campbell would have to pay $5,000.

"Q. Did he actually say that the jury or he based his or their verdict on the belief that Mr. Campbell had the insurance, or was that just an assumption or an inference from all that he said?

"A. As I recall, I do not know how he said it, but I got the impression—I feel that he did say it—I do not know his exact words—that he thought Mr. Campbell had $20,000 insurance and that he himself would have to pay $5,000 if they set the verdict at $25,000."

Some time after hearing the jurors' testimony, the judge advised counsel by letter that the verdict "would be set aside because of the improper conduct of the jury" and the case retried on the issue of the quantum of damages. However, the order does not state upon what ground the verdict was set aside. We do not know if it was vacated because deemed excessive or because the jurors discussed whether or not defendant was insured and some of them assumed that he was and considered that circumstance in their deliberations upon the quantum of damages, or both.

No courts have been more careful than those in Virginia to protect the secrecy of their jurors' deliberations or adhered more strictly to the principle that the statements, affidavits or testimony of jurors should not be received to impeach their verdict other than in exceptional cases and to prevent a miscarriage of justice.

"The general rule, as approved by the United States Supreme Court and by the courts of some of our sister States, permits more latitude in the admission of evidence of this character than has generally been permitted by the rule in Virginia. * * *" *Bryan* v. *Commonwealth*, 131 Va. 709, 723, 109 S. E. 477.

"It has long been settled in Virginia that the affidavits or the testimony of jurors to impeach their own verdicts are to be received with great caution and only in exceptional cases, and in order to prevent a failure of justice. *Litz* v. *Harman*, 151 Va. 363, 144 S. E. 477; *Bryan* v. *Commonwealth*, 131 Va. 709, 109 S. E. 477; *Washington Luna Park* v. *Goodrich*, 110 Va. 692, 66 S. E. 977; *Manor* v.

*Hindman*, 123 Va. 767, 97 S. E. 332; *Bull's Case*, 14 Gratt. (55 Va.) 613. The reason for the rule is that otherwise there would be held out to unsuccessful litigants and their friends the strongest temptation to tamper with jurors after their decision and might be productive of great evil. * * *" *Culpepper* v. *Robie*, 155 Va. 64, 91, 154 S. E. 687.

"The tendency of the courts, and especially in Virginia, is to hold that, as a rule, jurors should not be permitted to testify to their own misconduct in the jury room." Burks *Pleading and Practice*, 4th ed., § 324, p. 598.

"The testimony and affidavits of jurors are generally inadmissible to impeach their verdict, and this is especially true where the ground of impeachment is their own misconduct." 19 M. J. Verdict, § 34, p. 524. *Watson* v. *Coles*, 170 Va. 141, 195 S. E. 506; 138 A. L. R. 464; *Margiotta, et al.* v. *Aycock, Adm'r., etc.*, 162 Va. 557, 174 S. E. 831; *Fuller* v. *Commonwealth*, 190 Va. 19, 55 S. E. 2d 430.

In *Bryan* v. *Commonwealth, supra,* accused was convicted of murder in the second degree, but the trial court refused to admit testimony of the jurors as to their misconduct to impeach their verdict. In affirming that decision, we said:

"* * * It was conceded that the conduct of the jurors in arriving at their verdict could not be established except by the testimony of the jurors themselves, and the court held that their evidence would not be admissible for the purpose of impeaching their verdict. * * *

　　　*　　　*　　　*　　　*　　　*　　　*　　　*

"* * * It is unnecessary for us to say that there are no conceivable circumstances under which the testimony of jurors themselves may be resorted to in order to impeach their verdict. This court said in *Bull's Case*, 14 Gratt. (55 Va.) 613, 632: 'In view of all the authorities, and of the reason on which they are founded, we think that, as a general rule, the testimony of jurors ought not to be received to impeach their verdict, especially on the ground of their own misconduct, and without intending to decide that there are no exceptions to the rule, we think that even in cases in which the testimony might be admissible it ought to be received with very great caution. A contrary rule would hold out to unsuccessful parties and their friends the strongest temptation to tamper with jurors after their discharge, and would otherwise be productive of the greatest evils.' " At pages 722, 723.

The recent case of *Dozier* v. *Morrisette*, 198 Va. 37, 92 S. E. 2d 366, is readily distinguishable from the one before us. There the fact that the litigants carried liability insurance was brought to the attention of jurors during the trial by an interested insurance agent, whose company was the insurer of the vehicles involved. He discussed the insurance coverage with jurors in detail and thereafter the jurors commented upon and considered this fact in the jury room. In holding that the judgment sustaining the verdict should be reversed, we said:

"We are mindful of the rule that generally the testimony of jurors is inadmissible to impeach their verdict and that exceptions to the rule are rare. * * * We, however, subscribe to the exception that private communications, possibly prejudicial, between jurors and third parties, are forbidden and invalidate the verdict unless their harmlessness is made to appear. * * *" At page 40.

Pertinent to the question before us and to the realities involved in the trial of this character of case is what was said in 1938 in *Watson* v. *Coles, supra,* and restated in somewhat different language nine years later in *Carter* v. *Butler,* 186 Va. 186, 42 S. E. 2d 201. In the *Watson* case we said:

"While it is greatly to be desired that the question of insurance should not arise, or be discussed, in arriving at a verdict in this type of case, it is beyond the reach of the imagination to expect in this day and time, when insurance plays so important a part in the protection of those who operate automobiles, that men possessing the capacity of intelligence of average jurors, should not either speculate or turn their minds to the thought of the possibility of the owner or operator of an automobile having exercised precaution and prudence to secure a recognized and approved financial protection." At page 151.

Recognition of the fact that jurors are aware that there is extensive insurance coverage on the operators of motor vehicles and the realities resulting from that fact are commented upon in the *Carter* case as follows:

"Many jurymen at this time, in the trial of cases of this kind, know that most of the owners of motor vehicles are insured against liability for injuries which may be inflicted by such owners or their agents through negligence. In fact many jurors carry this kind of insurance. This knowledge certainly cannot operate against a plaintiff. He should not be penalized because a juryman knew, or as-

sumed, that there was insurance when the plaintiff and his counsel were at no fault in bringing this knowledge to the jury." At page 190.

As of today the public and jurors are more insurance conscious than they were when *Watson* v. *Coles, supra,* and *Carter* v. *Butler, supra,* were decided. One is indeed naive who does not know that most jurors are now aware of the fact that defendants in this character of tort action are, in a decided majority of instances, protected, in whole or in part, by public liability insurance and that such jurors often take that circumstance into consideration to some degree in their deliberations on what damages shall be awarded.

We are convinced that the evil that would result from permitting jurors, after return of their verdict, to impeach it by divulging and then testifying that they had considered and speculated upon whether the defendant was protected by liability insurance and state what effect their consideration of that circumstance had upon their award would be more detrimental and injurious to the administration of justice than the harm that may at times result from their assumption, discussion or consideration of the fact that a defendant is or is not protected by insurance.

Adhering to the declared principles in the above authorities, we conclude that the jurors could not impeach their verdict after their discharge by stating and testifying as to their beliefs, assumptions, deliberations and considerations of whether or not defendant was insured, and the effect of that circumstance upon their verdict.

██ Should the verdict have been set aside because excessive?

Plaintiff, aged thirty-five years, testified on September 23, 1955, as to how she was struck on July 3, 1954, the character of her injuries, their effect upon her nerves, health and ability to perform her household work, and the suffering experienced. Summarized, her evidence is that while walking between the rear of her parked car and another automobile, the defendant's car collided with the latter vehicle and knocked it forward, and she was thus "pinned between" the two cars. A small bone in her right leg was fractured, and the flesh, veins and muscles of both legs badly bruised. Defendant, who was under the influence of intoxicants, did not back his vehicle away from the car he had struck, and as plaintiff was unable to extricate herself, she remained in that painful position until some men separated the cars and took her to a hospital. She said she suffered excruciating pain until it was alleviated by opiates at the hospital where she remained for two weeks. For several days it was necessary that she

be administered opiates; her limbs were packed in ice from her feet to her hips for a day, but she developed infection in one leg where it had been bruised. Her left leg and foot were suspended for a week in a sling which was moved up and down to stimulate circulation, and her right leg was in a cast several days. At her home, she was confined to bed for four weeks but allowed use of a wheel chair at times. Thereafter for several weeks she was unable to do her household work incident to caring for a family of six. Five months after her injury, her husband died, and her handicap and difficulty, which she attributed to her injuries, to do her work at a motel that they conducted and to perform her household duties were related as follows:

"Q. Now, what is the reason that you are not able to take care of your house as you formerly did—home?

"A. Well, I have an awful lot of pain in my legs yet, a great deal of pain, and I have it all the time, especially in the left leg, and at other periods they both hurt, and I can't get down on my knees anymore to do the waxing and things that I used to do.

      *        *        *        *        *        *        *

"Q. Does the work that you do involve much walking or moving about there at the motel?

"A. Quite a bit.

"Q. Do you find that you can do that walking without discomfort and pain to yourself?

"A. No, sir."

Testimony of plaintiff's family physician who treated her was that she was severely hurt, a small bone in one leg broken, the muscles of both legs badly bruised and some blood vessels broken so that blood had to be withdrawn with a syringe; blisters developed on her legs due to tension of the skin from the swelling and her suffering at times was intense. An area on one leg had been rendered insensitive to pin sticks and the calf of one leg is now slightly smaller than the other; her gait is "not entirely normal;" there is some wasting away about the middle of one leg "as if the muscle had atrophied in that region," and in his opinion, "she definitely sustained some permanent injury."

Dr. Allan M. McKelvie examined plaintiff in March and June, 1955, and found that she still suffered from her injuries. He said that her pain was aggravated by changes in temperature; she had

difficulty in lifting her feet due to weakness in the muscles of the calves in her legs; an area of about three inches by two inches on the left leg was numb, and "indicated that some nerve had been damaged in that area." On the right leg he found "a wasting of the right calf muscles," limited "ability to turn the foot out," and "tightening of the heel cord behind the ankle." His summation was stated thus:

"On summing up, it was my impression that this patient had sustained severe contusions of both calves compatible with a degree of nerve injury on both sides. It was further my impression that the nerve injury on the right leg was rather worse than that in the left leg and had resulted in the weakness of the muscles supplying the right foot, which we have already described. * * * Mrs. Phillips had developed a degree of fibrosis in both calf muscle groups, that she had weakness of the right foot, she had evidence of nerve damage on the left side of the leg and that she had sustained some permanent disability as a result of these injuries."

He concluded by saying that it was "quite reasonable to assume that a muscle which has fibrosed might well go on contracting more."

Plaintiff expended $617.30 in hospital and medical treatment; was occasioned much pain and will suffer at times during the future. She has been permanently injured and incapacitated to a degree in the use of her limbs; rendered less able to perform her usual duties and her nerves have been impaired to some extent.

With the evidence of alleged misconduct of the jury excluded from the trial court's and our consideration as it must be from what we have already said, we find nothing in the amount of damages awarded to shock the conscience of a court.

Under the principle announced time and again in different phraseology and clearly stated below, it was within the province of the jury to fix the damages at the sum determined upon.

"There is no fixed rule or exact standard by which damages can be measured in personal-injury cases. The law does not assume that a particular injury calls for a definite amount of compensation, for a just compensation may vary widely in different cases, even where the physical injury is the same, especially where the injury is permanent or where physical or mental pain and suffering are involved. The amount to be awarded is therefore largely a question for the jury to be determined by it in view of the facts and circumstances of each particular case." 15 Am. Jur., Damages, § 71, p. 479.

This principle is elaborated upon in *Williams Paving Co., et al.* v. *Kreidl*, 200 Va. 196, 104 S. E. 2d 758, this day decided.

The judgment appealed from will be reversed, the verdict returned on the first trial reinstated, and judgment entered thereon.

*Reversed and final judgment.*