## Richmond

JOHN JETHRO LILLEY, JR. v. MARY HELEN SIMMONS, AN INFANT, ETC.

May 4, 1959.

Record No. 4903.

Present, All the Justices.

The opinion states the case.

*William Earle White (White, Hamilton, Wyche & Shell,* on brief), for the plaintiff in error.

*Albertis S. Harrison, Jr. (Robert W. Arnold,* on brief), for the defendant in error.

SPRATLEY, J., delivered the opinion of the court.

Mary Helen Simmons, an infant, instituted this action by her next friend against John Jethro Lilley, Jr., to recover damages for personal injuries sustained by her when a motorcycle on which she was riding as a passenger collided with a truck operated by Lilley. A jury returned a verdict in favor of the plaintiff for $125,000, on which the judgment appealed from was entered.

The defendant assigns three grounds for reversal of the judgment against him. He contends that the trial court erred in refusing to submit the issue of contributory negligence of the plaintiff to the jury, that the verdict is excessive, and that two members of the jury were guilty of misconduct.

The trial of the case was singularly well conducted. Each of the parties was represented by able and competent counsel, who properly presented their respective claims and defenses. There are few exceptions in the record, and no objection to the instructions except as above stated. The evidence is without substantial contradiction, and the issues were clearly submitted to the jury.

The accident occurred on June 7, 1957, in Sussex County, on Route 634, a paved road approximately 18 feet wide, running east and west. The time was between 3:45 and 4:00 p. m. on a clear day. The vehicle operated by Lilley was a pickup truck which was going east, and the motorcycle, upon which Miss Simmons was a passenger, operated by Keith Pennington, was bound west. Miss Simmons was riding behind Pennington on what was called a "buddy seat," an ordinary and standard seat to permit two persons to ride on a motorcycle, one behind the other. Helen had her arms around Pennington's waist, as she considered it safer and more comfortable than to use handgrips on the side of the motorcycle. She had her left foot on a rest provided for that purpose, and her right foot on a platform behind and touching the foot of the operator. She had ridden several times on a motorcycle; had known Pennington for years; and had ridden on the motorcycle here involved once before with his brother.

The motorcycle was in good condition, save for a connection with its muffler, which condition had nothing to do with the accident. Pennington had operated motorcycles for four years, was 19 years old, and a college student. He testified that he had driven this particular motorcycle frequently and was familiar with its operation.

Pennington said that he noticed the truck approaching him several hundred feet distant; that he pulled over to the righthand side of the road as far as he could, applied his brakes and started slowing down; that the truck, when he first saw it, was slightly to its left of the center of the road; that as it approached it came further on its left side; and that when it got quite close it suddenly made a sharp turn to its left, came over completely on its left side of the road, and collided with his motorcycle. The motorcycle was traveling around 30 to 35 miles an hour at that time, and it was, at all times prior to the collision, on the right of the center of the road. The collision occurred at a point estimated as 6 to 12 inches from the edge of the pavement on the north side of the road. The right front fender of the truck struck the right-hand side of the motorcycle. The truck continued across the north side of the highway a distance of 81 feet into a peanut field. Skid marks were made by the rear wheel of the motorcycle to a point 2½ feet from the northerly edge of the hard surface. The motorcycle, after the collision, turned to its left across the road for a distance of 71 feet.

An eye-witness, Elisha Butts, testified that he saw the pickup truck coming and that it was "boiling the water," meaning that it was making "right good speed." He also saw the motorcycle on its right side of the road, and said that it never got on its left side, nor gave any indication of going to that side.

Sam Edmunds said he saw the motorcycle traveling about 30 to 35 miles an hour, and the pickup truck coming so fast that he remarked to another person, "Look at that fool how he is driving."

Another witness, Gatewood Simmons, testified that fifteen minutes after the collision, Lilley, when asked what happened, said: "I don't know," and a minute or two later said, "It was all my fault."

Photographs of the road and place where the accident occurred show that the road is practically straight for almost one-half mile, with a slight curve from the western approach. Near the point of the accident there is a store on the southern side of the road, and two automobiles were parked in front of it. There were no unusual

conditions on the highway or in the surroundings where the accident occurred.

Defendant testified that he first saw the motorcycle about 300 yards from him; that "it appeared to be to the left of the center of the highway;" and that as the two vehicles approached each other, the motorcycle "swerved" as if to make a turn into the driveway of the wayside store. He did not observe any sign or other indication that the motorcycle driver intended to make a left turn, except the impression he got from the "weaving" or "wobbling" of the motorcycle. He, Lilley, moved "probably to the left of the center of the highway," and as the vehicles got closer, he "realized" that something had to be done because the motorcycle had come back on its right side of the road. At that time the truck was on its left side of the road, and "feeling" that there would not be sufficient time to get back to its right side, he pulled it further to the left and headed out toward the field. He said that, traveling at a lawful speed, he was 125 or 130 yards from the motorcycle when he mistakenly "assumed" that it was going to make a left turn. He added that he could have brought his truck to a complete stop and allowed the motorcycle to pass in safety on its proper side if he had not wrongly "guessed" what the mtorcycle was going to do. He did not recall telling Gatewood Simmons that the collision was due to his fault.

Lilley admitted there was no reason why he should not have stayed on his side of the road until the motorcycle had made the turn he thought it was going to make, and that the collision came about because of his erroneous assumption that it was about to make a left turn.

In rebuttal, both Pennington and Miss Simmons testified that the motorcycle at no time left its right side of the road, weaved, or wobbled in the road, or that either of them had any intention of turning to their left, or gave any indication of such intention. Pennington further testified that at the time of the accident, Lilley said to him, "Boy, I am just as sorry as I can be. It was all my fault."

Dr. E. Palmore Irving, the physician who treated Miss Simmons, said he saw her on June 7, 1957, when she was brought to the hospital. Said he:

"At the time she was seen, she was in deep surgical shock; near death. There were many injuries. The girl was unconscious at the time. Specifically, there was a deep cut, or laceration, which was very ragged, over the right side of her forehead, which went down

to the skull, but not through it. This was an injury, an abrasive type of injury from sliding on a pavement, or something, hitting something and then sliding along. So that a portion of the skin had actually been abraded away, like you take sand paper and do it.

"She had several minor cuts on her right hand.

"Her main injury was to her right leg. The leg from the knee to the foot was completely mangled. There was—Most of the skin had been ripped away; the muscles were all chewed up; the bone was in many, many, many pieces. The foot was not damaged particularly, except for the fact that the circulation had been cut off completely to the foot because the main artery to the lower limb had been severed.

"The injury extended well above the knee, all the way up to the hip. Part of the skin had been torn away from the thigh, or the knee cap, over the knee cap.

"There were fractures in the thigh bone at two different levels.

"The knee joint was torn up, as was the entire lower leg."

*     *     *     *     *     *     *

He said it was necessary to amputate the girl's right leg the night of the accident, following multiple blood transfusions. An infection developed, followed by gangrene. A week later a second operation was performed and the rest of the bone up to the upper fracture site was removed. Two months later an abscess of the stump developed with further infection. This required that the bone of the leg be removed to a point near the hip joint.

Dr. Irving further said:

"As far as the future is concerned with the amputation stump, once we have an infection, which happened in Helen's case, we can never be sure that there might be no further abscess definitely as time goes on. Of course we hope that never happens, but it is a definite possibility. Sometime it is necessary to remove dead bone fragments from an amputation stump such as hers. Other than that, she should have the useful amputation stump."

*     *     *     *     *     *     *

Speaking about her use of an artificial limb, he continued:

"Helen has a very high amputation stump, but fortunately, she

is young and she will learn to use it much better than an older person would. She can walk a little bit at the present time with a cane, very little, however. Right now she hasn't progressed far enough with the instructions and so forth. In another few months, though, she will be walking with a cane, and possibly in another six or eight, six months to a year or so, she will be able to get around pretty well without any support other than the limb."

Dr. William M. Deyerle, who examined plaintiff for the defendant, after setting out the physical condition of the plaintiff, testified as follows:

"Examination of her amputation stump revealed a well healed high thigh (indicating) stump approximately seven inches in length. There was still some tenderness but no evidence of any nerve tumor, neuroma formation. She had fair muscle power. It was not as good as one would expect eventually because of the fact she has only been making evidence [effort] to use the artificial limb for approximately two weeks, and the muscles, too, do not redevelop until they have been used over a period of time.

\*     \*     \*     \*     \*     \*     \*

"She will always limp; I will expect her to eventually get about without a cane—maybe a cane for prolonged walking—but that again depends on her willingness and desire to push ahead, and there again youth is on your side."

It was stipulated that plaintiff had incurred to the date of trial expenses for doctors, hospital, nurses and medical treatment to a total of $4,083.28.

[1] The evidence as the jury could have viewed it presented a glaring case of negligence on the part of the defendant. His own statements point conclusively to that end. The evidence of the plaintiff shows that Lilley, partially driving on the wrong side of the road, abruptly, suddenly and directly drove in front of and into the motorcycle when it was on its proper side of the road and approximately 6 to 12 inches from the extreme right edge. There was nothing to show that the condition of the motorcycle, or the actions of its driver or passenger, contributed in any way to the cause of the accident. The defendant was not entitled to have the issue of contributory negligence submitted to the jury. The principal difficulty of the jury was to determine the amount of the damages to which plaintiff was entitled.

■ A young, attractive girl, sixteen years of age, at the time of the accident, a junior in high school, a participant in all of the activities and sports usually engaged in by a young girl, has been rendered a cripple for life. The course of her life has been completely altered by the adjustments she must make and the frustration she must endure. There has been so little stump left upon which to attach an artificial limb that it will be necessary for her to have an entire limb,—upper, lower and foot, with various joints, bolts and sockets. She must have a harness attachment to wear around her thigh and body. The effect of her disability is almost unlimited from personal and social standpoints, not to mention her loss of advantages as a possible wife and mother.

There is no fixed rule or yardstick by which to measure the definite amount of damages for suffering endured and bodily disfigurement in personal injury cases. Whether or not an award is excessive must be determined in view of the facts and circumstances of each particular case. The determination of the amount is peculiarly within the province of the jury, and the award cannot be set aside unless it be shown that it is so out of proportion to the injury and loss suffered as to evidence prejudice, partiality, or corruption by the jury, or that the amount arrived at was brought about by a mistaken view of the merits of the case. *National Fruit Co., Inc.* v. *Wagner*, 185 Va. 38, 41, 37 S. E. 2d 757; *Simmons* v. *Boyd*, 199 Va. 806, 811, 102 S. E. 2d 292; *Phillips* v. *Campbell*, 200 Va. 136, 145, 104 S. E. 2d 765; *Williams Paving Co.* v. *Kreidl*, 200 Va. 196, 204, 104 S. E. 2d 758; 5 M. J., Damages, §§ 51-54, inclusive, pages 542 to 545; 14 Am. Jur., Damages, § 71, page 479; 25 C. J. S., Damages, § 196, page 910.

Many cases have been cited to us of verdicts found to be either excessive or not excessive. Comparison of verdicts in other cases is of little value in a case involving the circumstances and the results of the type before us. The amount here awarded must be viewed in the light of the injuries and suffering inflicted upon the plaintiff, a female of tender age, the severity and permanency thereof, and the effect upon her future life and activities. The award may allow her to purchase a home, labor-saving devices, and other physical conveniences; but it is, at best, a poor substitute for the deprivation of the privileges of a normal life and for the adjustments she must make in her personal and social activities. We cannot say, in view of the facts and circumstances in this case, that the amount of the verdict

shocks our conscience, is plainly wrong, or that there has been any deviation from right and justice.

Counsel for defendant, in his brief, gives little consideration to the assignment of error relating to the alleged misconduct of two jurors, save as to the effect of such conduct on the amount of the verdict. The circumstances involved in that question may be summarized as follows:

Shortly after the entry of judgment, defendant moved the court for a new trial upon the ground that two members of the jury, prior to the trial of the case, had discussed, heard discussed, and had sought to secure information with regard to the extent of the insurance coverage of the defendant.

The trial judge gave a full, careful and patient hearing to the question. The evidence in support of the motion was vague, inconclusive and tenuous. Each of the challenged jurors positively and unequivocally denied that he had ever discussed the subject of insurance coverage with anyone prior to the trial. They said that they did not know, either before, or during the trial, whether defendant had any insurance; and that they had formed no opinion with reference to the merits of the case before the trial, or discussed its merits with anyone. Each testified that he only tried to do what he and the rest of the jury thought was right. Several citizens vouched the good reputation of each of the two jurors as to truth, honesty and integrity.

The trial judge had the opportunity to observe the manner and demeanor of the witnesses who appeared before him with reference to the charge of misconduct. It was his duty to pass upon the credibility and weight of their statements, and determine whether or not a new trial should be awarded. Having exercised his discretion with all due care and caution, we find no error in his ruling denying the motion.

The guiding principles governing a determination of this question are fully set out in *Temple* v. *Moses*, 175 Va. 320, 334, 335, 8 S. E. 2d 262; and *Simmons* v. *Boyd, supra.*

The record shows that the defendant has had a fair and impartial trial before a qualified jury and an able judge. We find no error in the rulings of the court, and the evidence amply supports the finding of the jury. Accordingly, the judgment is affirmed.

*Affirmed.*