# Caterpillar Tractor Company

### v.

# Dennie E. Hulvey

Record No. 840379

March 6, 1987

Present: All the Justices

*Richard H. Lewis (William L. Carey; Lewis & Trichilo,* on briefs), for appellant.
*Charles·W. Sickels (Kattenburg, Sickels & Mische, P.C.,* on brief), for appellee.

COMPTON, J., delivered the opinion of the Court.

In this products liability case, there were three trials. In the first trial, the jury hung. In the second trial, the jury found for the defendant. That verdict was set aside by the trial court for alleged juror misconduct and a new trial was awarded the plaintiff. In the third trial, the plaintiff obtained a verdict and judgment for $250,000.

On appeal, the defendant attacks the action of the trial court in entering judgment on the third verdict as well as the court's action in setting aside the second verdict for juror misconduct. The issues relating to the second trial are dispositive of the appeal.

· Appellee Dennie E. Hulvey sued appellant Caterpillar Tractor Company for injuries received in July 1978 in Fredericksburg. At the time, the plaintiff was operating a forklift truck manufactured by the defendant. The plaintiff alleged that the seat-switch mechanism of the truck malfunctioned, causing his injuries.

The second trial concluded on Friday, February 25, 1983, after the jury had deliberated "four or five" hours. Within the next several days, juror Joy Ann Reges contacted plaintiff's trial attorney.

Subsequently, plaintiff's counsel arranged for a hearing upon a motion to set aside the verdict based on juror misconduct and sent letters to four jurors "inviting" them to attend the hearing. Two jurors, Reges and Patricia O. Most, appeared voluntarily and testified at a hearing held about a month after the trial. A second hearing on the motion to set aside was held four days later. John F. Olmstead, the juror accused of misconduct, testified at the second hearing.

Olmstead was president of a corporation and an attorney at law. He was licensed to practice in the District of Columbia but not in the Commonwealth of Virginia. The jury list showed his occupation only as "corporate executive." The fact that he was an attorney did not become known to the trial participants until after the jury had been sworn and the trial progressed. *See* Code § 8.01-353 (any error on the "copy of the jury panel shall not be grounds for a mistrial or assignable as error on appeal, and the parties in the case shall be responsible for verifying the accuracy of such information").

At the hearing, jurors Reges and Most testified that the trial judge admonished the jurors as the case commenced not to discuss the case among themselves until the issues finally had been submitted to them for decision and to consider only information properly received in evidence. Reges stated that, during a recess on the second day of the four-day trial, Olmstead "at one point opened his briefcase and said . . . in passing, 'What do you think of this?' and read us something about people who sue for injuries." The juror testified, "What I recall is, I think he quoted a percentage, but he did say what he was reading said that people who sue for injuries were people who didn't like to work . . . I remember it was derogatory toward people who sue for injuries." When asked the type of publication from which Olmstead was reading, Reges stated, "I remember him saying it was an insurance weekly. It looked like an insurance newsletter." The juror assumed Olmstead was "an insurance salesman" but, she said, "He told us he was a lawyer."

Testifying about this incident, juror Most stated there was "a milkman" on the jury who "was making little remarks, and thought maybe the jury was sort of a kangaroo court . . . ." Most testified that the milkman's remarks "prompted the other juror, who was a lawyer . . . he opened his briefcase and took out something saying something about . . . there are a lot of people that

like to take a company . . . ." Most testified that she "got a little bit upset and said something." The jury foreman, who already had been selected, then indicated the case should not be discussed at that stage of the proceeding. Most believed Olmstead was reading from "a magazine" and that the article to which Olmstead referred was "very short." According to Most, Olmstead read the article, "a paragraph or two," in the presence of all the jurors and returned the publication to his briefcase. Most stated that she thought "it" was "derogatory because we hadn't come to the conclusion that [the plaintiff] was trying to take the company . . . ." Most testified she said at the time that she "thought the [plaintiff] was a very high principled young man . . . ."

During the hearing, juror Reges described other incidents involving Olmstead. At one point during a recess, she stated, there were a "lot of comments" among the jurors about the case and "Mr. Olmstead said this is just a lot of garbage and he seemed to not like being here because it took a lot of his time." She testified, "One of the jurors . . . said it looked like somebody was going to fatten his pocketbook, and that pretty much started the conversation." According to Reges, Olmstead said "that the lawyers are taking a long time. But then we began to talk about the fact of the injury." She testified, "It was discussed by several of the jurors whether [the plaintiff] really was in any pain" and that Olmstead and another juror discussed the fact the plaintiff "could sit there in the chair for a long time" while the jurors found it difficult to sit in the uncomfortable chairs. Reges further testified that, during this general discussion, "Mr. Olmstead and another juror talked about the fact that people were suing corporations these days because they thought they could get a lot of money off of them." Also, Reges testified that, early in the trial, Olmstead "emphatically" said the trial judge was wrong in one of his rulings.

Describing the effect of Olmstead's conduct, Reges stated she "would never serve on another jury with a lawyer or with Mr. Olmstead again." She said she felt that Olmstead's legal training "gave him an advantage" and that during deliberations "he seemed to be so right; not right about what he was saying, but it was just so difficult that I reached the verdict I did in this case." Responding to a question from the trial judge, Reges stated that her decision in the case was influenced adversely by the conduct she had described.

Also describing the effect of Olmstead's conduct, Most stated that the foreman of the jury was "laid back a little bit" and that Olmstead "sort of took over." Most said that Olmstead "had a firm opinion" and that because he was "a corporation lawyer," she "was a little intimidated." According to Most, "it just seemed like [Olmstead] was taking over the discussions too much," and that "after the verdict was in, I had afterthoughts." According to Most, the matter "wasn't over" when she was discharged from service on the case because she was "feeling very unhappy."

Both Reges and Most testified, however, that during the four to five hour period of deliberations everyone on the jury fully discussed the issues, expressed opinions, and "spoke what they wanted to say." In addition, Most testified that Olmstead waited until the other six jurors had given their final views on the case before he expressed his opinions on the decision to be reached.

Testifying during the second day of the post-trial hearings, Olmstead admitted reading to the jury from a publication carried in his briefcase. Olmstead recalled that the incident occurred during final deliberations on the case, when one of the jurors asked why no information on insurance had been presented. According to Olmstead, he responded that the subject of insurance intentionally was kept from the jury because, he said, it would "taint" the jurors' views. At that time, Olmstead stated, he took the opportunity to read from "Board Room Reports," a business magazine he had possessed but discarded before the hearing, that reported "negligence suits are up substantially due to the recession." Olmstead testified he followed that comment with the statement, "isn't that ironic they're saying it's on the rise and look what kind of case we have." According to Olmstead, there was no further discussion among the jurors on the subject.

Olmstead testified that his "garbage" comment made in the jurors' presence was directed toward both counsel in the case who, in his opinion, were spending an undue amount of trial time qualifying expert witnesses by delving into every detail of the expert's professional background. Olmstead stated that the "whole jury was disgusted" about the length of time counsel were taking with the expert witnesses.

The trial court sustained the plaintiff's motion to set aside the verdict on two grounds. In a letter opinion, the court stated that "one of the jurors read to the other jurors in the jury room from an article obtained outside of the jury room, and made the state-

ment to and in the presence of the other jurors: 'This is a lot of garbage.' " In addition, the trial judge noted, "The Court cannot overlook the testimony of the lady juror that her verdict in this case was not only influenced by the (mis)conduct by the juror, but that had it not have occurred her verdict would have been different." The court further found that the conduct "prevented both parties from receiving a fair and impartial trial." Subsequently, the court entered an order setting aside the verdict and granting a new trial. This was error.

Recently, we have reviewed settled principles applicable to attacks upon verdicts based on alleged juror misconduct. In *Commercial Union Ins. Co. v. Moorefield,* 231 Va. 260, 343 S.E.2d 329 (1986), we noted that every litigant is entitled to a jury composed of individuals who "stand indifferent in the cause." Code § 8.01-358. We said that a motion to set aside a verdict for juror misconduct is addressed to the sound discretion of the trial court and, unless there has been an abuse of that discretion, the judgment below will not be reversed on appeal, citing *Litz v. Harman,* 151 Va. 363, 375, 144 S.E. 477, 480 (1928). 231 Va. at 265, 343 S.E.2d at 332. We also noted, however, that "neither the sole fact of irregularity nor the mere suspicion of injustice based upon the irregularity is sufficient to warrant setting aside a verdict." *Id.* Quoting earlier cases, we pointed out that the orderly administration of justice cannot be annulled by mere suspicion or possible inferences and that avoiding another trial, when the first trial was fair, is of paramount importance. *Id.*

Virginia has been more careful than most states to protect the inviolability and secrecy of jurors' deliberations. We have adhered strictly to the general rule that the testimony of jurors should not be received to impeach their verdict, especially on the ground of their own misconduct. *Phillips v. Campbell,* 200 Va. 136, 140-41, 104 S.E.2d 765, 767-68 (1958). "A contrary rule would hold out to unsuccessful parties and their friends, the strongest temptation to tamper with jurors after their discharge, and would otherwise be productive of the greatest evils." *Bull's Case,* 55 Va. (14 Gratt.) 613, 632 (1857). Moreover, the unanimous verdict is the best evidence of each juror's opinion of the case. When a juror denies the truth of the verdict and, if the denial be true, the juror "thereby convicts himself of the highest moral, if not legal perjury." *Id.* at 633. We have recognized, however, that there may be exceptional cases where juror testimony

might be admissible to impeach their verdict to prevent a miscarriage of justice. In such cases, that testimony should be received with great care and caution. *Id.* at 632. *Accord Margiotta* v. *Aycock,* 162 Va. 557, 568, 174 S.E. 831, 835 (1934).

Turning to the facts of the present case, we note that the defendant has not been consistent during the trial and appellate proceedings in its reliance on the principle that the testimony of these jurors was inadmissible to impeach their verdict. Although this prohibition was asserted in a memorandum of law filed in the trial court after the hearings below, no specific objection on this basis was made before the jurors testified. And, while the issue is mentioned in defendant's appellate briefs, its main argument is that the conduct complained of was not a sufficient ground for granting a new trial. Therefore, we will assume, without deciding, that this is one of those exceptional cases in which juror testimony is admissible in support of a motion to set aside the verdict for alleged juror misconduct.

Nevertheless, and because such testimony is to be received with great care and caution, we hold that the evidence fails to support a finding of juror misconduct sufficient to warrant setting aside the verdict and that the trial court abused its discretion in ruling to the contrary. Generally, we have limited findings of prejudicial juror misconduct to activities of jurors that occur outside the jury room. For example, the rule has been applied to expressions of opinion made by a juror to third persons during trial proceedings. *Haddad* v. *Commonwealth,* 229 Va. 325, 329 S.E.2d 17 (1985). In most cases, misconduct outside the jury room has prejudicially affected the jury's deliberation of the case by injecting facts connected with the case which had not been admitted in evidence. For example, the rule has been applied to an improper jury view, *McGuire* v. *Howard,* 203 Va. 965, 128 S.E.2d 281 (1962); *Kearns* v. *Hall,* 197 Va. 736, 91 S.E.2d 648 (1956); *Crockett* v. *Commonwealth,* 187 Va. 687, 47 S.E.2d 377 (1948); and *Litz* v. *Harman, supra*; and to unauthorized private conversations between jurors and third persons, *Harris* v. *Tractor Company,* 202 Va. 958, 121 S.E.2d 471 (1961); *Dozier* v. *Morrisette,* 198 Va. 37, 92 S.E.2d 366 (1956).

In the present case, the trial court focused upon the publication read by Olmstead and upon his "garbage" comment as the bases for setting aside the verdict. That alleged misconduct, however, occurred within the confines of the jury room and did not involve

procurement outside the jury room of specific facts *about the case* which later were injected into the deliberations.

The extraneous news from the publication about the proliferation of damage suits against corporations was nothing more than a reference to information which every individual acquires in his or her everyday experiences. One is naive who labors under the impression that jurors of today are not aware of the proliferation of lawsuits generally and damage suits against corporations specifically. As the evidence demonstrates, many of the jurors, not just Olmstead, discussed whether "somebody was going to fatten his pocketbook" and generally talked about insurance coverage. While such topics are irrelevant to the legal issues in a damage suit, we are convinced that the evil which would result from overturning verdicts based on post-trial disclosure of every irrelevant comment or discussion which occurred during jury deliberations would be more detrimental to the administration of justice than the harm which may possibly result from permitting robust, wide-ranging discussions in the jury room to proceed in an unrestrained manner. Indeed, the evidence here fails to show that the information contained in the publication alone caused any juror to vote for a defendant's verdict. Rather, Olmstead's entire "conduct" swayed the two jurors.

This case is similar factually to *Phillips* v. *Campbell, supra,* another damage suit. There, jurors discussed during deliberations whether defendant carried liability insurance and the extent of the insurance coverage. Some jurors assumed defendant carried insurance. A juror knew defendant's attorney was an "insurance lawyer" and two jurors stated that the matter of insurance influenced them in their individual decisions about the case. The trial court set the verdict aside for juror misconduct and this Court reversed, reinstating the verdict. Pointing out that the public and jurors now are conscious of the part insurance plays in damage-suit litigation, we noted "that such jurors often take that circumstance into consideration to some degree in their deliberations on what damages shall be awarded." 200 Va. at 143, 104 S.E.2d at 769.

The "garbage" comment, directed to dilatory trial tactics of counsel, and other statements by Olmstead, such as his disagreement with a ruling of the trial judge, were nothing more than the expressions of an opinionated, forceful juror. Under the guise of policing verdicts, we will not encourage trial courts to sift through jury debates to ferret out seemingly derogatory references gleaned

from the whole deliberative process. In many cases, heated debates involving sharp exchanges occur during the process of reaching verdicts. This case was no exception because not only were there statements derogatory to the plaintiff, *e.g.,* "people who sue for injuries [are] people who [don't] like to work," there also were comments which showed a bias in favor of the plaintiff, *e.g.,* one juror thought plaintiff was "a very high principled young man."

█ Viewed as a whole, the evidence discloses a situation where two jurors were influenced by the opinions of a third, dominant juror who was an attorney, a status which may have rendered him exempt from jury service, *see* Code § 8.01-341(5) (exempts "[l]icensed practicing attorneys"), but which did not make him incompetent to serve. Having been "a little intimidated" because Olmstead seemed to have an "advantage" during debate, the complaining jurors had "afterthoughts" and left the case "feeling very unhappy." In fact, one juror would not have agreed to the verdict but for the conduct of Olmstead. After the case had terminated, these two jurors assisted the losing party in an effort to annul the verdict by giving testimony which repudiated the jurors' own conduct in agreeing to the verdict at the time it was rendered. This effort at impeachment has been mounted even though the jury deliberated four to five hours during which, according to the uncontradicted evidence, every juror participated in a full discussion of the issues, expressed opinions, and "spoke what they wanted to say." Such circumstances do not justify nullification of this verdict.

Consequently, the judgment appealed from rendered in favor of the plaintiff on the third verdict will be reversed, the verdict returned in the second trial will be reinstated, and judgment will be entered here on that verdict in favor of the defendant.

*Reversed and final judgment.*