Present:  Hassell, C.J., Lacy, Keenan, Kinser, Lemons, and
Agee, JJ., and Carrico, S.J.

JERRY TERRELL JACKSON

                                        OPINION BY
v.  Record Nos. 031517 & 031518   JUSTICE CYNTHIA D. KINSER
                                     January 16, 2004
COMMONWEALTH OF VIRGINIA

          FROM THE CIRCUIT COURT OF THE CITY OF WILLIAMSBURG
                    AND COUNTY OF JAMES CITY
              Samuel Taylor Powell, III, Judge


     A jury convicted Jerry Terrell Jackson of two counts

of capital murder for the premeditated killing of Ruth W.

Phillips in the commission of rape or attempted rape, and

in the commission of robbery or attempted robbery in

violation of Code §§ 18.2-31(5) and -31(4), respectively.

The jury also convicted Jackson of statutory burglary, in

violation of Code § 18.2-90; robbery, in violation of Code

§ 18.2-58; rape, in violation of Code § 18.2-61; and petit

larceny, in violation of Code § 18.9-96.  At the conclusion

of the penalty phase of a bifurcated trial, the jury fixed

Jackson's punishment at death on each of the capital murder

convictions, finding "that there is probability that he

would commit criminal acts of violence that would

constitute a continuing serious threat to society."  The

jury also fixed punishment of two life sentences for the

rape and the robbery convictions, a 20-year sentence for

the burglary conviction, and a 12-month sentence for the

petit larceny conviction. The circuit court sentenced Jackson in accordance with the jury's verdict.[1]

Jackson appealed his non-capital convictions to the Court of Appeals pursuant to Code § 17.1-406(A). We certified that appeal (Record No. 031518) to this Court under the provisions of Code § 17.1-409 for consolidation with the defendant's appeal of his capital murder convictions (Record No. 031517) and the sentence review mandated by Code § 17.1-313. After considering Jackson's assignments of error and conducting our sentence review, we find no error in the circuit court's judgments and will affirm Jackson's convictions and the imposition of the death penalty.

I. FACTS

A. GUILT PHASE

Around 7 p.m., on Sunday, August 26, 2001, Richard Phillips discovered the body of his 88-year-old mother, Ruth Phillips, lying "twisted and exposed" on a bed in her bedroom. Phillips explained that his mother's "leg was twisted around, and her pubic region was exposed[; h]er breast was exposed[; and h]er nightgown was up around her neck." Mrs. Phillips lived alone in an apartment located

---

[1] The circuit court also imposed fines in the total amount of $102,500 as fixed by the jury.

in Williamsburg, and her son had become concerned about her well-being that day because she had not attended church and was not answering her telephone. After finding his mother's body, Phillips went outside and used a cellular telephone to call the "911" emergency number. While waiting for emergency personnel to arrive, he noticed that the screen on a bathroom window in the apartment had been removed.

A subsequent autopsy of Mrs. Phillips' body revealed a contusion on her nose and some hemorrhaging of minute blood vessels in her cheeks and eyes. There were also two lacerations to her vagina, one on the exterior area and the other one on the interior area. The medical examiner who performed the autopsy opined that the cause of death was asphyxia. Death by asphyxia, according to the medical examiner, occurs when the brain is without a supply of oxygen for four to six minutes although unconsciousness may come about within 15 to 30 seconds.

An investigator with the James City County Police Department, Jeff Vellines, went to Mrs. Phillips' apartment and collected several items of physical evidence. He found a window screen, mirror case, and cosmetic items outside the apartment near the master bathroom window. Inside, Vellines discovered a black pocketbook lying on the floor

3

next to Mrs. Phillips' bed, and a brown wallet underneath the pocketbook.  The wallet did not contain any money.  However, a white square piece of paper found in the wallet contained one latent fingerprint of value for identification purposes.  That fingerprint was later compared with the fingerprints of the defendant and found to be "one and the same."

Another investigator at the crime scene recovered a hair from Mrs. Phillips chest area and another hair on the bed below the stomach area.  During the autopsy of Mrs. Phillips' body, additional hairs were collected from her left thigh area.  Microscopic examination of those hairs by a forensic scientist revealed that one of the hairs recovered from Mrs. Phillips' thigh area and the other two hairs were pubic hairs, but they were not consistent with samples of Mrs. Phillips' pubic hair.  These same three hairs along with samples of the defendant's blood and hair were later subjected to mitochondrial DNA analysis.  According to the forensic scientist who performed the testing, Jackson could not be excluded as the source of the hairs found on Mrs. Phillips' body and bed.  The "mtDNA sequence data" of each of those hairs matched the "corresponding mtDNA sequence of the blood" taken from the defendant.

In December 2001, Vellines and Eric Peterson, also an investigator with the James City County Police Department, interviewed Jackson in the James City County Law Enforcement Center. After waiving his Miranda rights, Jackson admitted entering Mrs. Phillips' apartment, searching through and taking money out of her purse, and then exiting through a back window. Jackson stated that he did not know that Mrs. Phillips was at home, and that, when he turned on the light and was going through her purse, Mrs. Phillips, who was lying in bed, confronted him and stated, "What do you want? I'll give you whatever, just get out." In the defendant's words, "[I]t just scared me and I covered her up[.]" Jackson acknowledged that he held a pillow over her face for two or three minutes and tried to make her "pass out" so she could not identify him. Jackson stated that, when Mrs. Phillips stopped screaming, that was his "cue that she [had] passed out." He also admitted that he inserted his penis into her vagina while he was holding the pillow over her face.

Continuing, Jackson stated that he took Mrs. Phillips' automobile when he left her apartment and drove it to another apartment complex, where he abandoned the vehicle with the keys lying on top of it. He also used $60 that he had taken from her purse to purchase marijuana. Throughout

5

the interview, Jackson denied that anyone else was with him during this incident and insisted that he did not mean to kill Mrs. Phillips.

At trial, Jackson testified to a different version of the events that supposedly transpired at Mrs. Phillips' apartment.[2]  The defendant claimed that, on the day in question, he had been playing basketball until around midnight at the apartment complex where Mrs. Phillips lived.  Jackson stated that, as he was leaving, he came in contact with Alex Meekins and Jasper Meekins.  Jackson decided to participate in their plan to break into Mrs. Phillips' apartment.  According to Jackson, Alex entered the apartment through a window and then let Jasper and the defendant in through the front door.  While Jackson was looking through Mrs. Phillips' purse, she woke up and asked what was going on.  Jackson testified that the following events then took place in Mrs. Phillips' bedroom:

> Jasper Meekins, he put the pillow over her face and smothered her.  While he was smothering her, I think she was struggling, but I told him at the end when I heard some sound, she was gurgling, I told him to stop.  I pushed him off.  As we were leaving, I pulled her nightgown down.  I put the blanket over her, and I picked the pillow up initially and I didn't like what I saw, so I put the pillow back.

---

[2] Jackson also testified at a hearing on a motion to suppress his confession.  His testimony at that hearing also differed from his statement to the police.

6

Jackson explained that he confessed to Peterson because he thought that was what Peterson wanted to hear, and because he just wanted to "get out of there as fast as [he] could."  Jackson also explained that he never told the investigators about Jasper's and Alex's participation in the crime because he was "scared for [his] family on the streets" and had concerns about being a "snitch."  At trial, Jackson denied raping or killing Mrs. Phillips.  He also denied having any knowledge about who raped Mrs. Phillips or about how his pubic hairs got on her body.[3]

B. SENTENCING PHASE

During the sentencing phase of the bifurcated trial, the Commonwealth introduced into evidence 18 orders showing Jackson's convictions or adjudications of delinquency for such offenses as grand larceny, petit larceny, trespassing, drug possession, receiving stolen property, contempt of court, identity fraud, statutory burglary, credit card theft, and obtaining money under false pretenses.  The jury also heard evidence from two correctional officers about two incidents involving the defendant while he was

---

[3] A mitochondrial DNA analysis of blood taken from Alex Meekins showed that his mtDNA sequence did not correspond to the mtDNA sequence of the three hairs recovered from Mrs. Phillips' body.

7

incarcerated. In the first incident, Jackson refused to obey the orders of a correctional officer, and that refusal led to a scuffle with several officers as they attempted to remove Jackson's hand cuffs. The other incident involved an altercation between the defendant and another inmate.

In mitigation of the offenses, Jackson presented evidence about his adjustment and behavioral problems when he was a youth. In 1993, he was diagnosed with an "adjustment disorder with depressed mood and attention deficit, hyperactivity disorder." Jackson was evaluated again in 1996 because he was having behavioral problems at home and was not doing well in school. Jackson expressed resentment toward his stepfather and acted out his negative feelings by behaving aggressively. However, testing indicated that Jackson had average intellectual functioning.

During his school years, Jackson took medication for attention deficit hyperactivity disorder, but his mother reported to Jackson's pediatrician that her son continued to have behavioral problems at school, including fights. The defendant was eventually placed in a special school for students who cannot be controlled in a regular classroom

setting.  There was also evidence that the defendant

suffered physical abuse as a child.[4]

## II. ANALYSIS

### A. DISMISSAL OF INDICTMENTS

Jackson assigns error to the circuit court's refusal

to dismiss the capital murder indictments on the basis that

Code § 19.2-264.4(B) is unconstitutional.  The defendant

raised this claim in a pre-trial motion and supporting

memorandum.  The circuit court denied the motion.  Jackson

now argues that Code § 19.2-264.4(B) contains "a relaxed

evidentiary standard that leads to inherently unreliable

determinations of aggravating factors and unreliable death

sentences."  Citing the decisions in Ring v. Arizona, 536

U.S. 584 (2002), Apprendi v. New Jersey, 530 U.S. 466

(2000), and In re Winship, 397 U.S. 358 (1970), Jackson

also seems to suggest that, in Virginia, the aggravating

factors of future dangerousness and vileness are not

decided by a jury based on proof of those factors beyond a

reasonable doubt.[5]  We find no merit in the defendant's

arguments.

_____

[4] We will summarize additional facts and proceedings as
necessary to address specific issues.

[5] Any argument about the vileness aggravating factor is
irrelevant because Jackson's sentence of death was
predicated on the jury's finding of future dangerousness.

9

First, before the sentence of death may be imposed, the Commonwealth must prove at least one of the statutory aggravating factors beyond a reasonable doubt. Code § 19.2-264.4(C). Pursuant to Code § 19.2-264.3, a jury makes that determination, unless a jury trial is waived. Code § 19.2-257. Thus, to the extent Jackson suggests otherwise, he is incorrect.

Next, Code § 19.2-264.4(B) does not contain a relaxed evidentiary standard or produce unreliable determinations of aggravating factors. Evidence relevant to sentencing in the penalty phase of a capital murder trial is admissible, "subject to the rules of evidence governing admissibility." Id. We have held that this statute does not permit admission of irrelevant evidence. See Powell v. Commonwealth, 267 Va. ___, ___, ___ S.E.2d ___, ___ (2004) (decided this day); Remington v. Commonwealth, 262 Va. 333, 357, 551 S.E.2d 620, 634-35 (2001). Presentence reports from probation officers are specifically not admissible. Id. And, in Virginia, hearsay evidence also is not admissible during a penalty phase proceeding. Lovitt v. Warden, 266 Va. 216, 259, 585 S.E.2d 801, 826 (2003).

Finally, we note that, although the defendant argues that the full procedural safeguards employed during the guilt phase of a capital murder trial must also be provided

10

in the penalty phase, he never identifies what procedural safeguards were missing in his penalty phase proceeding. He also fails to enunciate what unreliable information was admitted into evidence during the penalty phase of his trial as a result of the supposed relaxed evidentiary standard.  In other words, Jackson's complaints about the provisions of Code § 19.2-264.4(B) are merely hypothetical in nature.  Thus, we conclude that the circuit court did not err in refusing to dismiss the indictments.

B. SUPPRESSION OF DEFENDANT'S STATEMENT

Jackson filed a pre-trial motion to suppress the statement that he made to the police investigators.  After hearing evidence and argument of counsel, the circuit court denied the motion, finding that Jackson's statement was voluntary and not the product of any psychological or physical coercion.

The defendant assigns error to the court's decision and argues that, "[b]ased on the totality of the circumstances, [his] will was overcome, his capacity for self-determination was critically impaired and his confession was not the product of a free and unconstrained choice."  Jackson claims that the investigators who questioned him engaged in trickery and deceit because of statements such as, "I will work with you . . . I will be

11

with you, thick and thin, boy . . . I will be in your corner" and "I'm here for you."  As further evidence that his will was overborne, Jackson points to his repeated denials of culpability during the first part of the interrogation, his initial confession to a different crime, and his lack of knowledge that the crime for which he was being interrogated carried a possible sentence of death. In accordance with his testimony at the suppression hearing, Jackson claims that he simply told the investigator what the investigator wanted to hear so that he, the defendant, would be free to go.

We find no merit in Jackson's arguments.  The circuit court found, and we agree, that there was no evidence of any promises of leniency, any force, any threats, any intimidation, any coercion, or any deprivation of the defendant's physical or mental needs.  Such "subsidiary factual determinations are entitled to a presumption of correctness."  Swann v. Commonwealth, 247 Va. 222, 231, 441 S.E.2d 195, 202 (1994).  The court also noted that the defendant had a reported IQ score of 100 and an educational level sufficient to read and write.  Furthermore, Jackson signed a waiver of his Miranda rights at the beginning of the interview.  And, he obviously understood the implications of making statements to the police because he

had been charged with crimes on two previous occasions after confessing to those crimes.

A defendant's waiver of Miranda rights is valid if made knowingly, voluntarily, and intelligently. Id.; Jenkins v. Commonwealth, 244 Va. 445, 453, 423 S.E.2d 360, 366 (1992). "The test for voluntariness is whether the statement is the 'product of an essentially free and unconstrained choice by its maker,' or whether the maker's will 'has been overborne and his capacity for self-determination critically impaired.' Id. at 453-54, 423 S.E.2d at 366 (quoting Culombe v. Connecticut, 367 U.S. 568, 602 (1961)). When determining whether a defendant's statement was voluntarily given, we examine the totality of the circumstances, which include the defendant's background and experience as well as the conduct of the police in obtaining the waiver of Miranda rights and confession. Swann, 247 Va. at 231, 441 S.E.2d at 202; Correll v. Commonwealth, 232 Va. 454, 464, 352 S.E.2d 352, 357 (1987).

Using these principles, we conclude that the defendant's statement was made knowingly, intelligently, and voluntarily. Thus, the circuit court did not err in admitting Jackson's incriminating statement.

C. JURY SELECTION

13

The defendant assigns error to the circuit court's failure to strike three prospective jurors for cause. An accused has a constitutional right to be tried by an impartial jury. See U.S. Const. amends. VI and XIV; Va. Const. art. I, § 8. By statute, a trial court is required to excuse any prospective juror who cannot "stand indifferent in the cause." Code § 8.01-358. However,

> [b]ecause the trial judge has the opportunity, which we lack, to observe and evaluate the apparent sincerity, conscientiousness, intelligence, and demeanor of prospective jurors first hand, the trial court's exercise of judicial discretion in deciding challenges for cause will be not disturbed on appeal, unless manifest error appears in the record.

Pope v. Commonwealth, 234 Va. 114, 123-24, 360 S.E.2d 352, 358 (1987) (citing Calhoun v. Commonwealth, 226 Va. 256, 258-59, 307 S.E.2d 896, 898 (1983)); accord Bell v. Commonwealth, 264 Va. 172, 191, 563 S.E.2d 695, 709 (2002); Green v. Commonwealth, 262 Va. 105, 115-16, 546 S.E.2d 446, 451 (2001); Stewart v. Commonwealth, 245 Va. 222, 234, 427 S.E.2d 394, 402 (1993). Thus, on appellate review, we defer to the trial court's decision whether to retain or exclude prospective jurors. Vinson v. Commonwealth, 258 Va. 459, 467, 522 S.E.2d 170, 176 (1999). Guided by these principles, we will now review the voir dire of the three jurors that the defendant claims should have been struck

14

for cause.  In doing so, we consider the prospective

juror's entire voir dire, not just isolated portions.  Id.;

Mackall v. Commonwealth, 236 Va. 240, 252, 372 S.E.2d 759,

767 (1988).

(1) Juror Reinsberg

The defendant moved the circuit court to excuse this

prospective juror because, among other reasons, she

indicated at one point during her voir dire that she would

probably require the defense to put on evidence during the

trial.  However, her overall responses to voir dire

questions relevant to this particular issue reveal that she

could "stand indifferent to the cause" and would not

require the defendant to present evidence to establish his

innocence:

> [DEFENSE COUNSEL]:  Do you have any feelings
> about the case from what you have read in the
> Gazette or from what you may have read in the
> Daily Press earlier?
>
> MS. REINSBERG:  The seriousness of it.
>
> [DEFENSE COUNSEL]:  Other than the seriousness?
>
> MS. REINSBERG:  The charges.
>
> [DEFENSE COUNSEL]:  Would you require the defense
> to put on evidence to change your mind or
> influence your decision considering what you have
> read?
>
> MS. REINSBERG:  Probably.
>
> THE COURT:  Let me ask, what do you mean by that?

15

MS. REINSBERG: From what we have read, I don't know, I was thinking the newspaper —

THE COURT: Is accurate?

MS. REINSBERG: Is accurate, so I would — I would want to know, it was accurate or inaccurate. Sometimes certain parts can be made up. That shouldn't be.

[DEFENSE COUNSEL]: May I go on? Considering that response, have you formed an opinion of some sort as to the guilt or innocence of the Defendant if you are going to require us to put on evidence?

MS. REINSBERG: No.

[DEFENSE COUNSEL]: That's based on what you have seen or read?

MS. REINSBERG: (Nods head.) Just the one article.

[DEFENSE COUNSEL]: Have you formed an opinion on what you have heard, the facts of what you have read, have you formed an opinion as to what punishment Mr. Jackson should receive as a result of what you —

MS. REINSBERG: No.

[DEFENSE COUNSEL]: You said that you would probably require us to put on some evidence. Tell us what you would be looking for from the defense.

MS. REINSBERG: Well, were there other people involved, for one.

* * *

[COMMONWEALTH'S ATTORNEY]: Judge, just a couple [of] follow-up questions if I may.

Ms. Reinsberg, one of the questions [defense counsel] asked you involved a response in which you said you would want to hear if other people

16

were involved.  Understanding that you read the newspaper, correct?

MS. REINSBERG:  Right.

[COMMONWEALTH'S ATTORNEY]:  That was Saturday's Gazette?

MS. REINSBERG:  Right.

[COMMONWEALTH'S ATTORNEY]:  Are you willing to put aside any opinions or thoughts you have regarding that newspaper article and judge this case based on the facts presented during the course of the trial?

MS. REINSBERG:  Definitely.

[COMMONWEALTH'S ATTORNEY]:  And are you going to hold the Commonwealth; that is, myself and Mr. McGinty, in our case to the proper burden of we have to prove the case beyond a reasonable doubt?

MS. REINSBERG:  Uh-huh.

[COMMONWEALTH'S ATTORNEY]:  And you understand that at sentencing, if the jury has convicted the Defendant of capital murder, that the burden is on us to prove certain things beyond a reasonable doubt —

MS. REINSBERG:  Right.

[COMMONWEALTH'S ATTORNEY]: — before you can impose the death penalty?

MS. REINSBERG:  Right, I understand.

[COMMONWEALTH'S ATTORNEY]:  Are you open-minded to both the death penalty and life in prison?

MS. REINSBERG:  Definitely.

[COMMONWEALTH'S ATTORNEY]:  Do you agree with the concept that the Defendant does not have to present any evidence at trial?
MS. REINSBERG:  Right.

17

[COMMONWEALTH'S ATTORNEY]:  In fact, the Defendant doesn't have to present any evidence at sentencing?

MS. REINSBERG:  Right.

[COMMONWEALTH'S ATTORNEY]:  Are you willing to follow that principle of law?

MS. REINSBERG:  Yes.

The voir dire of prospective juror Reinsburg demonstrates that the circuit court correctly concluded that this juror understood both the Commonwealth's burden of proof and the fact that the defendant did not have to present any evidence.  As we have previously stated, "[t]he real test is whether jurors can disabuse their minds of their natural curiosity and decide the case on the evidence submitted and the law as propounded in the court's instructions."  Townes v. Commonwealth, 234 Va. 307, 329, 362 S.E.2d 650, 662 (1987); accord Eaton v. Commonwealth, 240 Va. 236, 247, 397 S.E.2d 385, 392 (1990).  Prospective juror Reinsberg satisfied this test.  Thus, we find no manifest error in the circuit court's decision refusing to strike this juror for cause.

(2) Juror Baffer

Relying on the following series of questions, Jackson claims that the circuit court erred in refusing to strike prospective juror Baffer for cause:

18

[DEFENSE ATTORNEY]: Do you hold the belief that death is the appropriate punishment for a person who commits a murder, rape and/or robbery unless he can convince you otherwise?

MR. BAFFER: Yes.

[DEFENSE ATTORNEY]: Why is that?

MR. BAFFER: Because I believe in the State of Virginia, the Penal Code in the — it's prescribed.

* * *

[DEFENSE ATTORNEY]: You were asked an "automatic" question by the Commonwealth. Would you automatically vote to impose the death penalty on a person you determine beyond a reasonable doubt constituted a continuing serious threat to society?

MR. BAFFER: Yes.

This isolated portion of juror Baffer's voir dire is misleading because this prospective juror, when asked by the Commonwealth whether he would automatically impose the death penalty if the defendant were found guilty of capital murder, answered "No." The circuit court then engaged in the following exchange with prospective juror Baffer:

THE COURT: Mr. Baffer, let me ask you one question. [Defense counsel] asked you a question. He said that if you found beyond a reasonable doubt that a consideration of the Defendant's history and background there is a probability that he would commit criminal acts of violence that would constitute a continuing serious threat to society, he asked you if you found that, would you always vote to impose the death penalty, and you said yes. Is that your understanding of what the law in Virginia is?

19

MR. BAFFER:  I'm not sure what the law of Virginia is on that.  You said automatically impose the death penalty?

THE COURT:  If you found — you convicted the Defendant of capital murder and then you made a second finding, go to the second phase where evidence is presented regarding the possible sentence.  You have two possible sentences, life in prison or death, and the Court would instruct you that before you could impose the death penalty, you must find beyond a reasonable doubt that after consideration of the Defendant's history and background, there is a probability that he would commit criminal acts of violence that would constitute a continuing serious threat to society, you made that finding, is it your understanding that you must then impose the death penalty?

MR. BAFFER:  I don't know that I must impose.  I mean, get him out of society.  Life without parole removes him from society.

THE COURT:  That's correct.

MR. BAFFER:  If he would pose a danger, that would be adequate that he doesn't come back into society.

THE COURT:  What would be adequate, life without parole?

MR. BAFFER:  That would be adequate too, life without parole.

THE COURT:  The question [defense counsel] asked you is if you found that this future danger existed, would you automatically vote to impose the death penalty?

MR. BAFFER:  No, I would say no to that, if the alternative is he got life without parole, that would be adequate.

20

THE COURT: Well, that is your alternative. You only have two choices. If the Defendant is found guilty of capital murder, you have two choices: One is the death sentence; the other is life in prison without parole. They are your only two options, and if you were to find the Defendant guilty of capital murder, and if you found the condition of future dangerousness existed, could you consider both?

MR. BAFFER: I could consider both.

THE COURT: Would you automatically impose the death penalty if you found future dangerousness existed?

MR. BAFFER: No, if he was removed from society.

As stated previously, we must consider this juror's entire voir dire. See Vinson, 258 Va. at 467, 522 S.E.2d at 176. Upon doing so, it is clear that, while prospective juror Baffer stated at one point, in response to confusing questions by defense counsel, that he would automatically impose the death penalty, he subsequently clarified his position and stated that he would follow the court's instructions and consider both sentencing alternatives. We have held that it is improper to ask prospective jurors speculative questions regarding whether they would automatically impose the death penalty in certain hypothetical situations without reference to a juror's ability to consider the evidence and follow the court's instructions. Schmitt v. Commonwealth, 262 Va. 127, 141,

547 S.E.2d 186, 196 (2001).  Thus, we conclude that the circuit court ruled properly in seating this juror.

### (3) Juror Berube

Jackson moved to strike prospective juror Berube on the basis that she answered "No" to one question asking whether she would be able to consider all mitigating factors in making her decision whether to impose a life sentence without parole or the death penalty.  However, the answer to this one isolated question does not accurately portray this juror's positive assertions during voir dire that she would follow the court's instructions and consider all mitigating evidence when making her sentencing decision.  Furthermore, when overruling the defendant's motion to strike this juror, the circuit court noted that juror Berube had given careful thought to her answers and that she did not initially understand what mitigating factors are.  Thus, we conclude that the circuit court did not err in finding that this juror would be fair and impartial.

### D. JUROR MISCONDUCT

During a recess on the third day of trial, the jurors asked whether they could discuss among themselves the evidence and testimony that had already been presented. The parties and the circuit court agreed that the jurors

22

should not do so until after the close of all the evidence and the jury's deliberations began. When the jury returned to the courtroom after the recess, the court instructed the jurors that they should deliberate and discuss the evidence only after all the evidence had been introduced. The court further admonished the jurors to keep an open mind and to refrain from deciding any issue until the case was submitted to them for their deliberations.

The defendant did not object to those instructions or ask for a mistrial at that time. Thus, to the extent that Jackson now argues that the court should have granted a mistrial as soon as it learned of the jury's question, which suggested, in Jackson's view, that the jury had already been discussing the case, such a claim was not preserved for appeal. See Rule 5:25.

Jackson filed a post-trial motion for a new trial and/or an evidentiary hearing based on allegations that the jury had discussed his guilt or innocence prior to the close of all the evidence. In support of the motion, the defendant submitted an affidavit from alternate juror Picataggi. In the affidavit, Picataggi stated that she had "witnessed and heard discussion of this case, and its outcome, among the jurors before the close of evidence and in direct violation of the instructions of the court."

23

At a hearing on Jackson's motion, defense counsel advised the court that he had contacted all the jurors after the conclusion of the trial because of his concerns about the jury's question on the third day of trial. Counsel also told the court that this alternate juror agreed to speak with him but that many of the jurors would not do so or stated that such alleged discussions among the jurors did not occur before the close of the evidence. Defense counsel asked the court to summons all the jurors to an evidentiary hearing and to question them individually about what, if any, discussions occurred before the jury retired to deliberate. The court decided to summons only alternate juror Picataggi to a hearing for the purpose of questioning her about the allegations stated in her affidavit.

At that hearing, Picataggi explained, in response to questions from the court, that she had heard three discussions, two in the jury room and one at a local restaurant where the jury had gone for lunch. She acknowledged that no third person, such as the restaurant owner or a waitress, participated in any of those discussions, either by comments to the jury or by comments from any of the jurors. Picataggi could not recall whether any discussions ensued after the jurors asked the court

24

during a recess whether they could discuss the evidence they had already heard.

Picataggi also could not remember exact words used, but she described

> a discussion in regard to the testimony of the detective and [the defense counsel's] questioning him in regard to the videotape and that was discussed among the jurors in that — well, they didn't particularly like the way that he was questioning the detective, but that ultimately he got to the truth or to the bottom of it.

However, she admitted that at no time did any juror come to a conclusion about Jackson's guilt or innocence. During cross-examination by the defendant, Picataggi indicated that the discussions concerned things that had happened in the courtroom and matters that had been presented there, and were not necessarily limited to comments about the lawyers' styles of questioning.

After hearing Picataggi's testimony, the circuit court denied the defendant's motion for further investigation and for a new trial. The court concluded that the jurors' comments addressed the cross-examination of investigator Peterson and defense counsel's techniques of attacking that witness's credibility. The court found "no probable misconduct and clearly no prejudice" to the defendant.

On appeal, Jackson argues that the evidence of jurors' discussions "establishes a probability of prejudice and

25

brings into question the fairness of the trial."  The defendant also asserts that the comment that "he got to the truth or to the bottom of it" went to the issue of guilt or innocence.  At a minimum, the circuit court, according to Jackson, should have conducted an evidentiary hearing at which all the jurors should have been questioned.  We do not agree with the defendant's position.

In Virginia, we strictly adhere " 'to the general rule that the testimony of jurors should not be received to impeach their verdict, especially on the ground of their own misconduct.' "  Jenkins, 244 Va. at 460, 423 S.E.2d at 370 (quoting Caterpillar Tractor Co. v. Hulvey, 233 Va. 77, 82, 353 S.E.2d 747, 750 (1987)).  We have also generally " 'limited findings of prejudicial juror misconduct to activities of jurors that occur outside the jury room.'" Id.  (quoting Caterpillar Tractor Co., 233 Va. at 83, 353 S.E.2d at 751.)  For example, in Haddad v. Commonwealth, 229 Va. 325, 330-331, 329 S.E.2d 17, 20 (1985), evidence showing juror misconduct in the form of expressing an opinion to third persons during trial proceedings was sufficient to establish a probability of prejudice to the accused.

Applying this same probability of prejudice standard, we find that Jackson failed to carry his burden to

establish such prejudice.  See id.  Upon reviewing Picataggi's affidavit, the circuit court properly convened an evidentiary hearing to investigate further her allegations of juror misconduct.  See Kearns v. Hall, 197 Va. 736, 743, 91 S.E.2d 648, 653 (1956) (when allegations of jury misconduct are sufficient to indicate the verdict was affected thereby, a trial court has a duty to investigate and determine whether, as a matter of fact, the jury did engage in misconduct).  The evidence presented at that hearing amply supported the court's conclusions that there was probably no misconduct and clearly no prejudice to the defendant.

At best, Picataggi could only recall juror discussions regarding defense counsel's techniques of cross-examination and the comment "he . . . got to the bottom of it."  She could not remember any other specific comments by the jurors, or whether any juror discussions about the evidence transpired after the court instructed them not to do so in response to the jury's question.  And, Picataggi admitted that no juror expressed an opinion about Jackson's guilt or innocence.  That fact distinguishes this case from Haddad.

Thus, we conclude that neither a new trial nor any further investigation by the circuit court was warranted. We said many years ago that "[i]f gossip of [jurors] among

themselves, or surmise, is to be the basis of new trials there would be no end to litigation." Margiotta v. Aycock, 162 Va. 557, 568, 174 S.E. 831, 835 (1934). That statement remains true today.

### E. VIDEO-TAPED CONFESSION AND TRANSCRIPT

Jackson asserts that the circuit court erred in allowing the jury to use a transcript of his video-taped confession while the video was played during the trial, in overruling his motion for a mistrial because of problems that occurred while watching the video tape and using the transcript, and in allowing the jury to review the video-taped confession during their deliberations. We find no merit to any of these claims.

The circuit court directed that a transcript of the video tape be prepared because portions of the video tape were inaudible and the court concluded that it would be helpful for the jurors to have the transcript while they were viewing the video tape. At trial, Jackson claimed the transcript was not accurate and thus objected to the jury's use of it. The circuit court disagreed and found that the transcript was as accurate as it could be and that it was incomplete because some portions of the video tape were inaudible.

Before the jurors watched the video tape, the court instructed them that the transcript was "merely a guide . . . [and was] not evidence." The court further instructed that the evidence was the tape itself and the audio portion of it, and that the transcript would be retrieved after the video tape was played and could not be taken into the jury room during deliberations. Finally, the court told the jury that, although there would be places in the transcript stating that the video tape was inaudible, it was, nevertheless, the jury's "responsibility to listen to the tape and determine what, in fact, [was] being said." The court reminded the jurors of these instructions when they finished viewing the video tape.

"A court may, in its discretion, permit the jury to refer to a transcript, the accuracy of which is established, as an aid to understanding a recording." Fisher v. Commonwealth, 236 Va. 403, 413, 374 S.E.2d 46, 52 (1988); accord Burns v. Commonwealth, 261 Va. 307, 330, 541 S.E.2d 872, 888 (2001). Although Jackson argues on appeal that the transcript was inaccurate, he points only to the fact that some words were missing because the video tape was inaudible at certain points, that the transcript was incorrectly paginated, and that one page was missing. However, those problems did not render the transcript

inaccurate. In light of the lengthy instructions that the circuit court gave the jurors regarding the purpose of the transcript and their use of it, we are persuaded that the court did not abuse its discretion in allowing the jury to use the transcript of the defendant's video-taped confession. See id. (trial court did not abuse its discretion by allowing jury to use transcript that was not complete).

During the playing of the video tape, it was discovered that the pages in one juror's transcript were partially out of order. After that problem was corrected, the court directed the Commonwealth to rewind the video tape approximately two minutes. Subsequently, it was discovered that the jurors' transcripts were missing one page. Playing of the video tape was momentarily stopped while that problem was corrected. Because of these problems and Jackson's assertion that the jurors rarely looked up from the transcript and thus did not watch the video tape, he moved for a mistrial at the conclusion of the playing of his video-taped confession. The circuit court overruled the motion, finding that the jurors had paid close attention to both the video tape and the transcript. The court also noted that the amount of the video tape that was replayed was minimal and that all the

problems with the transcripts were quickly corrected.  The court did not err in overruling the motion for a mistrial.

Finally, Jackson claims that undue emphasis was placed on his confession and investigator Peterson's testimony regarding his interrogation of the defendant because the jury was allowed to take the video tape into the jury room during deliberations.  However, Code § 8.01-381 provides that "[e]xhibits may, by leave of court, be" carried into the jury room.  "Exhibits requested by the jury shall be sent to the jury room or may otherwise be made available to the jury."  Id.  Thus, any exhibit introduced into evidence, including a defendant's written or recorded statement, is available to jurors during their deliberations.  See Pugliese v. Commonwealth, 16 Va. App. 82, 90, 428 S.E.2d 16, 23 (1993).  That jurors may put emphasis on certain evidence, perhaps a particular exhibit or testimony of a certain witness, is simply part of what they do when weighing and considering the evidence.  Id. Thus, the court did not abuse its discretion in allowing the jury to take the video tape into the jury room during deliberations.

### F. PHOTOGRAPHS

Jackson first challenges the circuit court's ruling allowing the Commonwealth to use an "in-life" photograph of

31

the victim.  Mrs. Phillips' son identified the photograph during his direct examination,[6] and the Commonwealth displayed the photograph during its closing argument in the guilt phase of the trial for approximately seven seconds. The court did not allow the jury to take the photograph into the jury room.  The defendant claims that the photograph had no probative value and was used to arouse the sympathies of the jury.

We conclude that the circuit court did not abuse its discretion in allowing the use of the "in-life" photograph of Mrs. Phillips.  See Bennett v. Commonwealth, 236 Va. 448, 471, 374 S.E.2d 303, 317 (1988) (no abuse of trial court's discretion to admit photograph showing victim one month before she died).  The photograph was displayed only twice for brief periods of time.  Additionally, the photograph was not given to the jury or taken into the jury room during deliberations.

The defendant also claims that the circuit court erred in admitting into evidence photographs of Mrs. Phillips taken during the autopsy.  He specifically challenges the admission of duplicate photographs of Mrs. Phillips' face

---

[6] The circuit court noted for the record that the "in-life" photograph of Mrs. Phillips was displayed in the Commonwealth's case-in-chief for approximately 15 to 20 seconds but that it was not passed to the jury.

and an enlarged photograph of her vaginal area.  The defendant asserts that any probative value of these photographs was outweighed by their prejudicial and inflammatory effect upon the jury.

Although Jackson does not identify the challenged photographs by exhibit number, we assume that he is complaining about two photographs of Mrs. Phillips' face, Commonwealth Exhibit Numbers 47 and 48; and the enlarged photograph of her vaginal area, Commonwealth Exhibit Number 51.  These are the photographs to which the defendant objected at trial.  The Commonwealth introduced each of these during the medical examiner's testimony.  Number 47 depicted the front of Mrs. Phillips' face, and number 48 was a side view.  Number 51 showed a laceration in the rear portion of her vaginal area.  Each photograph depicted different injuries suffered by Mrs. Phillips.

We agree with the circuit court's conclusion that the two facial photographs were "not shocking" or "gruesome" and that Number 51 was simply "part of the facts of this particular case."  Thus, the court did not abuse its discretion in admitting these photographs.  The photographs were relevant to the issues of premeditation, intent, and malice.  See Gray v. Commonwealth, 233 Va. 313, 342, 356 S.E.2d 157, 173 (1987); Stockton v. Commonwealth, 227 Va.

33

124, 144, 314 S.E.2d 371, 384 (1984).  And, contrary to the defendant's argument, any prejudicial effect of the photographs did not outweigh their probative value.

### G. USE OF PILLOW FOR DEMONSTRATIVE PURPOSES

During closing argument, the Commonwealth used a pillow to demonstrate the length of time that Jackson held the pillow over Mrs. Phillips' face.  The Commonwealth asked the jury how such an act could not be indicative of a specific intent to kill.  The defendant objected on the basis that the Commonwealth was not using the actual pillow found at the crime scene and that the demonstration would incite and inflame the jury.  The circuit court overruled the objection but directed the Commonwealth to tell the jury that the pillow was "not the actual size and shape of the pillow used" to suffocate Mrs. Phillips and that the Commonwealth was using a pillow only for demonstrative purposes.

"Admission of items of demonstrative evidence to illustrate testimonial evidence is . . . a matter within the sound discretion of a trial court."  Mackall, 236 Va. at 254, 372 S.E.2d at 768.  We conclude that the circuit court did not abuse its discretion.  As directed by the court, the Commonwealth instructed the jury that the pillow was not the actual pillow found at the crime scene and that

it was being used for demonstrative purposes.  Furthermore, the court also told the jury that the pillow was not the one found on Mrs. Phillips' bed.  Finally, the Commonwealth's demonstration did not distort the evidence concerning the manner of Mrs. Phillips' death.

## H. AUTOPSY REPORT

Jackson asserts that the circuit court erred in admitting the autopsy report into evidence and allowing that report to be given to the jury.  When the defendant objected to the introduction of the report, the court indicated that it would redact any opinion expressed by the medical examiner in the report.  Although Jackson asserts on brief that the report was admitted into evidence during the medical examiner's testimony, that factual statement is not accurate.  The defendant cross-examined the medical examiner about his report, but at no point during his testimony was the autopsy report admitted into evidence.  The report is not marked as an exhibit and is only stamped as having been filed in both the General District Court and the Circuit Court of the City of Williamsburg and County of James City.

Although Code § 19.2-188 provides that "[r]eports of investigations made by the Chief Medical Examiner, his assistants or medical examiners . . . shall be received as

35

evidence in any court or other proceeding," the autopsy report concerning Mrs. Phillips was not admitted into evidence in this case. Thus, this claim has no merit.[7]

## I. SUFFICIENCY OF EVIDENCE

Jackson moved to strike the Commonwealth's evidence as to guilt on the basis that the evidence was insufficient to prove that he possessed the willful, premeditated, and deliberate intent to kill Mrs. Phillips. The defendant asserts that his testimony showed that the death of Mrs. Phillips was accidental and not premeditated. We do not agree.

When the sufficiency of the evidence is challenged on appeal, we review the evidence in the light most favorable to the prevailing party at trial, in this case the Commonwealth, and accord to it all reasonable inferences fairly deducible therefrom. Commonwealth v. Bower, 264 Va. 41, 43, 563 S.E.2d 736, 737 (2002); Higginbotham v. Commonwealth, 216 Va. 349, 352, 218 S.E.2d 534, 537 (1975). We are obliged to affirm the judgment of the circuit court unless that judgment is plainly wrong or without evidence to support it. Code § 8.01-680; Beavers v. Commonwealth,

---

[7] In Fitzgerald v. Commonwealth, 223 Va. 615, 630, 292 S.E.2d 798, 806-07 (1982), we held that the Commonwealth was not required to elect between introducing an autopsy report or a medical examiner's testimony.

245 Va. 268, 282, 427 S.E.2d 411, 421 (1993). When proof of premeditation is the subject of a sufficiency challenge, evidence showing that the premeditation was only slight or momentary is sufficient to sustain the conviction. Id. This is so because "[p]remeditation is an intent to kill that needs to exist only for a moment." Green v. Commonwealth, 266 Va. 81, 104, 580 S.E.2d 834, 847 (2003) (citing Peterson v. Commonwealth, 225 Va. 289, 295, 302 S.E.2d 520, 524 (1983)). The question of premeditation is generally a factual issue. Id.

Despite Jackson's self-serving testimony that he did not smother Mrs. Phillips with a pillow and told Jasper Meekins to stop doing so, the jury could have concluded, based on the defendant's confession, that he placed a pillow over Mrs. Phillips face and held it there for four to six minutes even though she would have become unconscious within 15 to 30 seconds. That evidence is sufficient to show that the defendant had a willful, premeditated, and deliberate intent to kill Mrs. Phillips. See id. Thus, we will not reverse the jury's finding of premeditation.

### J. TESTIMONY FROM VICTIM'S SON

Jackson claims that the circuit court abused its discretion by allowing Mrs. Phillips' son to testify during

37

the sentencing phase of the trial because he remained in the courtroom after he testified during the guilt phase in violation of the court's order sequestering the witnesses. According to the defendant, the son's presence in the courtroom throughout the trial unduly influenced the jury. We do not agree.

Pursuant to the provisions of Code § 19.2-265.01, a victim, which includes Mrs. Phillips' son, see Code § 19.2-11.01(B), "may remain in the courtroom and shall not be excluded unless the court determines, in its discretion, the presence of the victim would impair the conduct of a fair trial." We cannot say in this case that the court abused its discretion by allowing Mrs. Phillips' son to remain in the courtroom after he testified during the guilt phase of the trial. The court correctly concluded that Mrs. Phillips' son did not learn anything while he was present in the court that would have changed or affected his victim impact testimony during the penalty phase. Thus, the defendant was not prejudiced by the fact that Mrs. Phillips' son testified during the penalty phase after having heard much of the testimony during the guilt phase. See Bennett, 236 Va. at 465, 374 S.E.2d at 314 (a trial court has discretion to decide whether a witness who violates an order excluding witnesses from the courtroom

38

can testify, and prejudice to the defendant is one factor to consider when answering that question).

## K. ISSUES PREVIOUSLY DECIDED

In assigning error to the circuit court's denial of the defendant's pretrial motion challenging the constitutionality of Virginia's capital murder statutes, Jackson presents several reasons why he contends that the death penalty on its face and as applied violates the Sixth Amendment, the Eighth Amendment, and the Fourteenth Amendment to the United States Constitution, as well as Article I, §§ 8, 9, and 11 of the Constitution of Virginia. We have previously rejected these arguments and find no reason to depart from our precedent.

(1) The aggravating factor of future dangerousness is unconstitutionally vague because it does not provide meaningful guidance to the sentencing jury so as to avoid an arbitrary and capricious infliction of the death penalty – rejected in Bell, 264 Va. at 203, 563 S.E.2d at 716; Lovitt v. Commonwealth, 260 Va. 497, 508, 537 S.E.2d 866, 874 (2000); Smith v. Commonwealth, 219 Va. 455, 476–78, 248 S.E.2d 135, 148–49 (1978).

(2) Virginia's capital murder statutes do not require instructions to the jury regarding the duty to consider mitigating evidence, the meaning of mitigating evidence,

the absence of any burden of proof on a defendant with regard to the mitigation evidence presented, and the liberty that each juror has to consider and give effect to mitigating evidence – rejected in Buchanan v. Angelone, 522 U.S. 269, 275-76 (1998); Lovitt, 260 Va. at 508, 537 S.E.2d at 874; Mickens v. Commonwealth, 252 Va. 315, 320, 478 S.E.2d 302, 305 (1996); Joseph v. Commonwealth, 249 Va. 78, 82-83, 452 S.E.2d 862, 865 (1995).

(3) The use of unadjudicated conduct to prove the aggravating factor of future dangerousness fails to comport with the constitutional requirement of reliability for capital sentencing – rejected in Bell, 264 Va. at 203, 563 S.E.2d at 716; Satcher v. Commonwealth, 244 Va. 220, 228, 421 S.E.2d 821, 826 (1992); Stockton v. Commonwealth, 241 Va. 192, 210, 402 S.E.2d 196, 206 (1991).

(4) A sentence of death under Code § 19.2-264.5 is unconstitutional because a trial court may consider hearsay evidence contained in a post-sentence report – rejected in Lenz v. Commonwealth, 261 Va. 451, 459, 544 S.E.2d 299, 303-04 (2001); Cherrix v. Commonwealth, 257 Va. 292, 299-300, 513 S.E.2d 642, 647 (1999).

(5) A sentence of death under Code 19.2-264.5 is unconstitutional because a trial court is not required to

set aside a death penalty upon a showing of good cause -
rejected in <u>Chandler v. Commonwealth</u>, 249 Va. 270, 276, 455
S.E.2d 219, 223 (1995); <u>Breard v. Commonwealth</u>, 248 Va. 68,
76, 445 S.E.2d 670, 675-76 (1994).

(6) Virginia's death penalty statutes do not provide
for meaningful appellate review, including the
proportionality review — rejected in <u>Emmett v. Commonwealth</u>,
264 Va. 364, 374-75, 569 S.E.2d 39, 46  (2002); <u>Lenz</u>, 261
Va. at 459, 544 S.E.2d at 304; <u>Bailey v. Commonwealth</u>, 259
Va. 723, 740-42, 529 S.E.2d 570, 580-81 (2000); <u>Satcher</u>,
244 Va. at 228, 421 S.E.2d at 826.

(7) The expedited review of death penalty cases is
unconstitutional — rejected in <u>Morrisette v. Commonwealth</u>,
264 Va. 386, 398, 569 S.E.2d 47, 55 (2002).

## L. ISSUES WAIVED

At oral argument, the defendant indicated that he was
withdrawing assignment of error number 8, that the circuit
court "erred in denying defendant's motion to dismiss
capital murder indictment for failure to allege aggravating
elements."  In response to questions from the Court, he
also acknowledged that he was no longer asking the Court to
reverse his conviction on the basis that the circuit court
erred by failing to grant a change in venue, as asserted in
assignment of error number 7.  Specifically, defense

41

counsel stated, "We could [seat] a jury. . . . So to say that venue alone is not what I am seeking in this case for an error."  Thus, we will not consider these two assignments of error.

Next, we note that the defendant did not brief assignment of error number 20, that the circuit court "erred in allowing the prosecutor in his argument during the penalty phase to argue matters beyond those introduced during that phase of the case."  In accordance with our precedent, we will not consider this assigned error.  See Wolfe v. Commonwealth, 265 Va. 193, 207, 576 S.E.2d 471, 479 (2003); Kasi v. Commonwealth, 256 Va. 407, 413, 508 S.E.2d 57, 60 (1998).

### III. STATUTORY REVIEW

### A. PASSION AND PREJUDICE

Pursuant to the provisions of Code § 17.1-313(C), we are required to determine whether the defendant's sentence of death was imposed under the influence of passion, prejudice, or other arbitrary factors.  On this issue, Jackson claims that the jury's verdict fixing his punishment at death was the result of passion and prejudice because the circuit court failed to grant a change of venue and because the court did not strike prospective jurors Reinsberg, Baffer, and Berube for cause.  As already noted,

42

we rejected the substantive issue regarding those three jurors and did not address the change of venue question because the defendant withdrew it as a substantive basis for a reversal of his conviction. We nonetheless have examined both of these issues to ascertain whether they created an atmosphere of passion and prejudice that influenced the jury's sentencing decision. We conclude that they did not do so.[8] We also find no other indication that the sentence of death was imposed under the influence of passion, prejudice, or other arbitrary factors.

## B. PROPORTIONALITY REVIEW

We are also required to determine whether the sentence of death in this case is "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Code § 17.1-313(C)(2). To comply with this statutory directive, we compare this case with "similar cases" by focusing on instances where the victim was murdered during the commission of robbery or rape and the death penalty was imposed based upon the future dangerousness aggravating factor. The purpose of

_____

[8] We note that a jury was seated with relative ease in this case. See Thomas v. Commonwealth, 263 Va. 216, 231, 559 S.E.2d 652, 660 (2002) ("The ease with which an impartial jury can be selected is a critical element in determining whether the prejudice in the community stemming

43

our proportionality review is to identify and invalidate the aberrant death sentence. See Orbe v. Commonwealth, 258 Va. 390, 405, 519 S.E.2d 808, 817 (1999).

Our review in this case leads to the conclusion that the defendant's sentence of death is not excessive or disproportionate to sentences generally imposed in this Commonwealth for capital murders comparable to Jackson's murder of Mrs. Phillips. Although we consider all capital murder cases presented to this Court for review, see Burns, 261 Va. at 345, 541 S.E.2d at 896-97; Whitley v. Commonwealth, 223 Va. 66, 81-82, 286 S.E.2d 162, 171 (1982), we cite the following cases as examples: Roach v. Commonwealth, 251 Va. 324, 468 S.E.2d 98 (1996); Beavers, 245 Va. 268, 427 S.E.2d 411; Yeatts v. Commonwealth, 242 Va. 121, 410 S.E.2d 254, (1991); O'Dell v. Commonwealth, 234 Va. 672, 364 S.E.2d 491 (1988). With regard to the proportionality analysis, the imposition of the death penalty in Beavers is particularly persuasive because of the striking similarity between the facts in that case and those presented here. Both cases involved elderly women who were raped by their assailant and smothered with a pillow.

---

from pretrial publicity is so wide-spread that the defendant cannot get a fair trial in that venue.")

44

IV. CONCLUSION

For the reasons stated, we find no error in the judgments of the circuit court or in the imposition of the death penalty.  We also see no reason to commute the sentence of death in this case.  Therefore, we will affirm the judgments of the circuit court.

<u>Record No. 031517 — Affirmed</u>.
<u>Record No. 031518 — Affirmed</u>.

45